HARRY SHERROD, APPELLEE, V. STATE OF NEBRASKA
DEPARTMENT OF CORRECTIONAL SERVICES, APPELLANT.
557 N.W.2d 634

Filed January 3, 1997.   No. S-94-941.

Don Stenberg, Attorney General, and John R. Thompson for
appellant.

Michael G. Goodman, of Cannon, Goodman, O'Brien &
Grant, P.C., for appellee.

WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ., and REAGAN, D.J.

GERRARD, J.

In a suit filed pursuant to the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1994), the district court entered judgment in favor of appellee Harry Sherrod. It is from this judgment that the State of Nebraska appeals. We affirm.

### FACTUAL BACKGROUND

While an inmate at the Nebraska State Penitentiary, Sherrod was beaten by his cellmate, Roland Palmer, with a 20-inch-long, 1-inch-diameter solid steel bar. Palmer had complained to Department of Correctional Services (DCS) personnel about how he and Sherrod were unable to get along and that he wanted to be moved to a different housing unit.

Palmer testified that he contacted his housing unit manager to see if he could be moved to a different housing unit. Palmer said he did not fully explain his problems with Sherrod to the unit manager, but, instead, simply let him know that he wanted a change of cellmates. Palmer said the unit manager instructed him to fill out an interview request, known as a kite, and mail it to Fred Britten, supervisor of the housing unit managers. Palmer testified that he completed a kite and mailed it to Britten through the prison mail system. This kite was dated October 19, 1989. In 1989, October 19 fell on Thursday. Palmer stated that he was not good with dates and that the date he actually mailed the kite could have been either October 18 or October 20. Furthermore, Palmer testified that he could not recall the day of the week he wrote and mailed the kite, only that it was toward the end of the week.

Although equivocal, Palmer admitted he put the kite in the mail hoping it would be acted upon during that week, and he knew the kite had to reach Britten by Friday in order for Britten to take any action before the end of the week. Palmer testified that he wrote the kite after talking to the unit manager and that he mailed the kite immediately after writing it. The unit manager testified that Palmer verbally requested a cell change "on or about October 19."

The trial testimony revealed that normally a kite placed in the prison mail system before 9 p.m. would be distributed early the next morning. Moreover, Britten agreed that if Palmer had mailed his kite on Thursday, Britten would have received it Friday morning. However, Britten testified that he did not recall reading Palmer's kite on Friday, October 20, nor did he have a specific recollection of any kites received that day. Britten said he believed he reviewed all distributions received October 20 on that same day. Britten admitted testifying in a deposition that he may have been too busy to have read all distributions received on October 20, if a prison disciplinary hearing was held that day. However, Britten testified at trial that after giving his deposition, he examined his records and found he did not attend a disciplinary hearing that day and therefore likely read all distributions received. Britten testified at trial that he first read Palmer's kite on Monday, October 23, the day after Palmer assaulted Sherrod.

In pertinent part, Palmer's kite stated:

> I would like to move to housing unit 2 with Duane Sanders. My present roomate [sic] (Sherrod) and I do not get along. He always eat [sic] my food and mess [sic] with my belongings without my permission. We are constantly at each others [sic] throats with insults and derogatory statements. *If this keeps up I'll be at his throat with something else.*

(Emphasis supplied.) Britten agreed that the last sentence of this kite constituted a threat to Sherrod and that in response, he would have had his staff locate Palmer, interview him to ascertain the reason for making the threat, and place Palmer in holding until all reports by staff made pursuant to their investigation had been evaluated. Moreover, Harold Clarke, director of the DCS, agreed that Palmer's kite constituted a threat which would require him to be separated and isolated immediately. Clarke testified that assuming Britten received Palmer's kite on Friday, October 20, he would have been negligent in not taking action that day.

On Sunday, October 22, after an early morning argument concerning whose turn it was to clean their cell, Palmer left his housing unit and crossed the prison yard, passing through a

locked gate attended by two guards, to the "weight pile," an area located near a guard tower where inmates lift weights. A video surveillance camera was mounted on the wall next to the tower and was pointed directly at the weight pile. Palmer testified that his sole purpose in going to the weight pile was to get the metal bar he would later use to assault Sherrod.

Palmer knew a certain weight machine had a metal bar which could be removed and said taking this metal bar was the fastest way he could think of to obtain a weapon to use against Sherrod. Upon arrival at the weight pile, Palmer went directly to the weight machine with the unsecured metal bar and pretended to work out, all the time watching the nearby guard tower. When the guards were not looking, he removed the metal bar and hid it under his bulky hooded sweatshirt and coat. Palmer immediately went back across the yard to his housing unit with his hands in his coat pockets, holding the metal bar concealed under his sweatshirt. Palmer said that he occasionally worked out with weights and that his usual workout lasted about 45 minutes; however, on this occasion, he was only at the weight pile for a couple of minutes.

Palmer did not encounter any guards on his way back to his housing unit, and the locked and guarded gate which he passed through going to the weight pile was now open and unguarded. Palmer said that he stood outside his housing unit for about 5 minutes waiting for the guard inside to become distracted or busy before going into the vestibule. Against prison policy, Palmer was allowed to enter his housing unit a short time prior to "doors"—a 10-minute period beginning 5 minutes before the hour when inmates could properly exit and enter their housing units.

Once inside, Palmer requested access to his cell. This whole time, Palmer never removed his hands from his coat pockets. Palmer said that when he entered his cell, Sherrod was sitting down watching television. When Sherrod stood up, Palmer withdrew the metal bar and struck Sherrod across the head, left shoulder, and left leg. Sherrod was able to wrestle Palmer to the ground, and the two were quickly separated by prison personnel.

Sherrod sustained a severe cut to his head, requiring stitches. Following the attack, Sherrod began experiencing severe

headaches and pain radiating down his spine and through his shoulder blades. Sherrod testified that prior to the attack he had headaches; however, these prior headaches were of a different kind, frequency, and quality than the severe headaches he suffered after the attack. Sherrod also stated that after the attack, he suffered from dizziness, blurred and double vision, memory loss, and tingling and loss of feeling in his extremities. Sherrod's headaches and radiating pain continued after his release from prison.

In prison, Sherrod received treatment for his headaches from a neurologist, Dr. Richard Sposato. Dr. Sposato testified that he reviewed cervical and head x rays, as well as an EEG taken of Sherrod, and concluded that all examinations showed no abnormalities. Dr. Sposato opined that Sherrod's headaches were posttraumatic or a continuation of migraine headaches which afflicted Sherrod prior to Palmer's attack.

After release from prison, Sherrod sought further medical treatment for his continuing headaches and was diagnosed as suffering from posttraumatic myofascial pain syndrome, a chronic sleep disorder, and aggravation of a formerly asymptomatic congenital defect, Chiari-1 malformation.

In his deposition offered at trial, Dr. Kip Burkman, a physical medicine and rehabilitation physician, testified that he began treating Sherrod for his headaches and associated pain in December 1992. Dr. Burkman diagnosed Sherrod as suffering from posttraumatic myofascial pain syndrome of the posterior neck and shoulder girdles. It was Dr. Burkman's opinion that the cause of this condition was Palmer's assault on Sherrod. In addition, Dr. Burkman testified that Sherrod's sleep disorder could also be attributed to myofascial pain syndrome.

When Sherrod's headaches and neck pain did not go away after treatment, Dr. Burkman prescribed an MRI. Results of the MRI disclosed the presence of a Chiari-1 malformation. A Chiari-1 malformation is a herniation of the cerebellum into the area of the first cervical vertebra at the end of the skull. This herniation puts pressure on the spinal cord and can cause tingling, numbness, pain in the back of the head and neck, and pain radiating down both arms, as well as other symptoms.

Dr. Charles Taylon, a neurosurgeon, testifying in behalf of Sherrod, agreed that Sherrod had a Chiari-1 malformation. Dr. Taylon offered the opinion that Sherrod's previously asymptomatic Chiari-1 malformation was aggravated and became symptomatic as a result of Palmer's attack. Furthermore, Dr. Taylon opined that a portion of Sherrod's sleep apnea could be attributed to his now symptomatic Chiari-1 malformation.

Pursuant to § 81-8,214, this matter was tried to the district court sitting without a jury. The trial court noted that the State is under a duty to exercise reasonable care to protect inmates from the intentional acts of other inmates and that the State failed in this instance to exercise reasonable care with respect to the assault upon Sherrod. The trial court found that the kite sent by Palmer either was or should have been received and read by Britten on the Friday before the assault and that failure to act in view of the threat contained in the kite constituted negligence.

In addition, the trial court found that the State was negligent in failing to adequately monitor the weight pile area and in failing to monitor Palmer's movements the day of the assault. Finally, the court concluded that the State was negligent in not recognizing the accessibility of a dangerous instrument such as a 20-inch-long, 1-inch-diameter solid steel bar not permanently affixed to weight-lifting equipment accessible to all inmates.

The trial court found Sherrod's injuries to be proximately caused by the State's negligence and entered judgment against the State in the sum of $198,145.38.

## ASSIGNMENTS OF ERROR

The State asserts the district court erred in essentially two respects: (1) in not finding the acts or omissions complained of on the part of the DCS were shielded by the discretionary function exception to the State Tort Claims Act and (2) in finding that the State acted negligently and that Sherrod's injuries were proximately caused by the assault.

## SCOPE OF REVIEW

The trial court's findings of fact in a proceeding under the State Tort Claims Act, § 81-8,209 et seq., will not be set aside unless such findings are clearly incorrect. *Moore v. State*, 245 Neb. 735, 515 N.W.2d 423 (1994).

On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts. *Allemang v. Kearney Farm Ctr., ante* p. 68, 554 N.W.2d 785 (1996).

## ANALYSIS

*Discretionary Function Exception.*

Sherrod filed his negligence action against the DCS pursuant to the State Tort Claims Act, found at § 81-8,209 et seq. Section 81-8,215 provides: "In all suits brought under the State Tort Claims Act, the state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." However, § 81-8,219(1), the discretionary function exception to the act, provides that the act shall not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion is abused . . . ."

Sherrod asserts that the discretionary function exception is an affirmative defense and that because the State did not plead it in its answer, raise it in its pretrial conference memorandum, or present evidence in support of the defense at trial, the State cannot now argue this issue for the first time on appeal. The State argues that the discretionary function exception is not an affirmative defense, but, rather, is an issue of jurisdiction. As such, this issue may be raised at any time in the proceedings. Moreover, the State argues that whether it may avail itself of the discretionary function exception is a question of law and that thus, this court is required to reach a conclusion independent of that of the trial court.

We hold that the exceptions found in § 81-8,219 to the general waiver of tort immunity provided for in § 81-8,215 are matters of defense which must be pled and proved by the State. " 'The essence of affirmative defenses is to concede that while the plaintiff otherwise may have a good cause of action, the cause of action no longer exists because some statute or rule permits defendant to avoid liability for the acts alleged.' " *Nebraska Pub. Emp. v. City of Omaha*, 244 Neb. 328, 332, 506

N.W.2d 686, 690 (1993) (quoting *Brown v. Ehlert*, 255 Mont. 140, 841 P.2d 510 (1992)).

Subject matter jurisdiction is conferred by the general waiver of tort immunity found in § 81-8,215. It then becomes a matter of defense to plead and prove that the cause of action no longer exists due to the applicability of an exception to the general waiver of immunity found in § 81-8,219. See, *Stewart v. United States*, 199 F.2d 517 (7th Cir. 1952); *State v. Zimring*, 52 Haw. 477, 479 P.2d 205 (1970). Cf., *Carlyle v. United States, Dept. of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) ("[o]nly after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted . . . does the burden fall on the government to prove the applicability of a specific [exception]"); *Prescott v. U.S.*, 973 F.2d 696 (9th Cir. 1992) (recognizing that both *Stewart* and *Carlyle* place burden of proving exception to waiver of tort immunity with the government); *Autery v. U.S.*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993) ("[a]ll circuits to address the issue have concluded that 'plaintiff bears the burden of persuading the court that it has subject matter jurisdiction under the [Federal Tort Claims Act's] general waiver of immunity,' but 'the burden of proving the . . . exception lies with the government'" (quoting *Prescott v. U.S., supra*)).

An affirmative defense not raised or litigated in the trial court cannot be urged for the first time on appeal. *Nebraska Pub. Emp. v. City of Omaha, supra*. The State failed to raise the issue of discretionary function in its answer or list it as a genuinely controverted issue of law or fact in its pretrial conference memorandum. Furthermore, an examination of the record as a whole does not allow this court to conclude that the State tried the issue of discretionary function to the trial court. Accordingly, the State may not litigate this issue for the first time on appeal.

*Trial Court Finding of Negligence.*

A jailer is bound to exercise, in the control and management of the jail, the degree of care required to provide reasonably adequate protection for his inmates. *Daniels v. Andersen*, 195 Neb. 95, 237 N.W.2d 397 (1975); *O'Dell v. Goodsell*, 149 Neb.

261, 30 N.W.2d 906 (1948). The trial court found the DCS breached this duty in five respects.

First, the trial court found that the kite dated October 19, 1989, was or should have been received and read by Britten on Friday, October 20, and that failure to act on the threat contained in the kite constituted negligence. The State argues that there was no evidence presented which would allow the court to conclude that any member of the penitentiary staff actually saw Palmer's kite prior to the incident and that Palmer's testimony concerning when he wrote and mailed the kite is at best equivocal.

The findings of the trial court with respect to this issue are not clearly incorrect. A letter properly addressed, stamped, and mailed raises a presumption that the letter reached the addressee in the usual course of the mails. *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992). This presumption may be rebutted with any relevant evidence; however, positive testimony by the addressee that a letter was not received simply raises a question of fact to be decided by the trier of fact. *Waite Lumber Co., Inc. v. Carpenter*, 205 Neb. 860, 290 N.W.2d 655 (1980).

Britten testified that an interview request deposited in the prison mail before 9 p.m. on Thursday would be sorted and distributed to the appropriate department for consideration on Friday. Clarke testified that a kite placed in the mail on Thursday would be distributed for consideration by Friday morning. Clarke conceded that had Britten read Palmer's kite, he would have been in violation of prison rules and procedures for not taking action on the threat.

Furthermore, Britten testified that his normal routine is to read all kites distributed to him in a given day and that on October 20, 1989, he did not recall reading Palmer's kite. Although in his deposition Britten stated he could have been busy on that particular occasion and not read his distributions, he qualified this statement at trial, claiming to have reviewed his records and discovered he was not too busy to read his mail on October 20 and that on that date, he does not recall receiving Palmer's kite.

Palmer's testimony as to when he placed his kite in the prison mail system is equivocal. Palmer admitted that he dated his kite October 19, 1989, but beyond this Palmer claimed to remember little else. Palmer testified that he was not very good with dates and that he could have written and mailed the kite on either October 18 or October 20. Sherrod's counsel confronted Palmer with a statement that he purportedly made in which Palmer claimed he had mailed the kite on Thursday because he wanted the kite to be acted upon before the weekend. Palmer denied having specifically said he mailed the kite on Thursday, but testified that when he mailed the kite, he hoped it would be acted upon before the weekend.

We are mindful that in reviewing a judgment awarded in a bench trial, the appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996). Although Palmer did not mail his kite through the U.S. mail, Sherrod produced sufficient evidence in this case with respect to the reliability of the prison mail system to show that it should be accorded the same presumption given a letter properly addressed, stamped, and mailed through the U.S. mail. Britten's bare denial of receipt is insufficient to rebut this presumption as a matter of law.

In addition, notwithstanding Palmer's equivocations, there was sufficient evidence to allow the trial court to conclude that Palmer had properly mailed his kite on October 19, 1989. Moreover, the trial court addressed how it viewed Palmer's equivocations when in its order the court wrote, "Palmer's 'uncertainty' as to dates is unconvincing," and "Although the 'kite' is dated October 19, 1989, Palmer testified that he was 'not sure' whether the date was accurate (apparently having second thoughts with respect to his recollection related to counsel several days previous to the trial) but he did place it in the mail immediately."

The State asserts that even if Britten received Palmer's kite on Friday, he had no duty to read the kite that day and that without Britten's reading the kite, Palmer's attack on Sherrod is not

reasonably foreseeable. However, Britten initially testified that he, in fact, read all of his distributions on October 20, 1989, but did not recall whether Palmer's kite was one of those distributions. In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re Estate of Disney*, 250 Neb. 703, 550 N.W.2d 919 (1996). Since the trial court resolved the issue of whether Britten received Palmer's kite on Friday against the State, in light of Britten's admission, there was sufficient evidence to support the conclusion that Britten read Palmer's kite on Friday, but failed to act.

Accordingly, the trial court was not clearly incorrect in finding that the State either knew or should have known of Palmer's threat to Sherrod. The State admits that had it known of Palmer's threat to Sherrod, it would have been negligent to not immediately separate the cellmates and begin an investigation. Thus, the finding of negligence on the part of the State in this regard is supported by sufficient competent evidence.

The remaining four findings of negligence by the trial court center on the State's duty of reasonable care with respect to security within the penitentiary. Specifically, the trial court found the State was negligent in (1) failing to adequately monitor the weight pile, (2) failing to adequately monitor Palmer's movements within the yard, (3) allowing Palmer to return to his housing unit outside the "doors" period, and (4) failing to recognize that a 20-inch-long, 1-inch-diameter solid steel bar not permanently affixed to a weight machine would be used as a weapon by an inmate.

Having determined that the district court was not clearly incorrect in finding negligence with respect to the State's failure to act when it knew or should have known of Palmer's threat concerning Sherrod, we conclude that it is unnecessary to determine whether the district court was clearly incorrect with respect to any of its other findings of negligence.

*Trial Court Finding of Proximate Cause.*

Finally, the State asserts that the injuries Sherrod now complains of were not proximately caused by Palmer's attack. In support of this assertion, the State contends that the record

reflects Sherrod complained of headaches long before Palmer's attack and that the physician who treated Sherrod after his injuries, Dr. Sposato, was of the opinion that Sherrod's current symptoms were not caused by Palmer's attack. Instead, Dr. Sposato opined that Sherrod's current symptoms were caused by his employment in the meatpacking industry subsequent to his release from prison.

On the other hand, Dr. Burkman testified that Sherrod's post-traumatic myofascial pain syndrome resulted from the attack Sherrod suffered in prison. Dr. Taylon was of the opinion that Sherrod's previously asymptomatic Chiari-1 malformation was aggravated and became symptomatic as a result of the prison assault.

In essence, the State asks this court to give less weight to Sherrod's experts, Drs. Burkman and Taylon, and more weight to its expert, Dr. Sposato, than did the trial court. This we will not do. Determining the weight that should be given expert testimony is uniquely the province of the fact finder. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996). There was clearly sufficient evidence to support the trial court's finding that Sherrod's injuries now complained of were a result of the assault in prison.

## CONCLUSION

Finding no merit in the State's assignments of error, we affirm the judgment of the district court.

AFFIRMED.

FAHRNBRUCH, J., not participating.