ANTHONY L. NICHOLS, APPELLANT, V.
COUNTY OF DOUGLAS, APPELLEE.
585 N.W. 2d 105

Filed September 15, 1998.   No. A-96-1241.

John K. Green for appellant.

James S. Jansen, Douglas County Attorney, and Christine A. Lustgarten for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and INBODY, Judges.

MILLER-LERMAN, Chief Judge.

Anthony L. Nichols, a former inmate at the Douglas County Correctional Center (DCCC), brought an action under the Political Subdivisions Tort Claims Act against the County of Douglas, alleging that he suffered injuries after falling while attempting to get into his upper bunk bed at DCCC. In a bench trial, the district court for Douglas County found that DCCC was not liable to Nichols for his injuries. On appeal, Nichols essentially argues that the trial court erred in failing to determine that DCCC was negligent in designing, installing, main-

taining, and repairing the upper bunk in room 8 of module F prior to Nichols' fall from the upper bunk on January 3, 1991. Nichols also argues that DCCC knew or should have known that the upper bunk bed in his cell was in need of repair prior to his fall on January 3. For the reasons set forth below, we affirm.

## BACKGROUND

On April 25, 1996, Nichols filed a second amended petition pursuant to the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. §§ 13-901 to 13-926 (Reissue 1987). In his petition, Nichols stated that he is currently residing in Georgia and that he is seeking damages for injuries he sustained on January 3, 1991, while housed at DCCC awaiting trial on criminal charges. Nichols alleged that he suffered injuries when his assigned bunk collapsed as he attempted to get into the bunk. Nichols alleged that his injuries were caused by DCCC's negligence and that DCCC had been negligent in failing to (1) properly inspect his bunk to ensure that it was in proper and safe working order, (2) ensure that his room was properly equipped and that his bunk was in useable condition, (3) properly repair and maintain the bunk in his room, (4) adequately design and construct the upper bunks, and (5) install an adequate method of ingressing and egressing the upper bunks. Further, Nichols alleged that DCCC knew or should have known that his bunk was not in proper and safe working order or useable condition. Nichols alleged that as a result of DCCC's negligence, he has suffered and will continue to suffer mental anguish and pain and suffering and that he must continue to undergo medical care and treatment. Nichols requested judgment against DCCC for general and special damages as well as interest and costs.

On April 30, 1996, DCCC filed a demurrer to Nichols' second amended petition, which after hearing, the district court denied in a journal entry dated May 14, 1996.

On May 23, 1996, Nichols filed a motion to bifurcate the action on the issues of liability and damages, which was subsequently granted by the district court.

On June 3, 1996, DCCC filed an answer to Nichols' second amended petition. In its answer, DCCC admitted that Nichols had fallen while getting into his bunk, but denied having any

knowledge of any alleged problem with Nichols' bunk or any of the bunks adjacent to the one in Nichols' room or notice of the same. DCCC denied that it had been negligent in any of the respects alleged by Nichols in his petition.

A trial on the issue of liability was set for July 15 and 16, 1996. At this bench trial, the evidence showed the following:

Initially, the cells at DCCC were single-occupancy cells. In the early 1980's, the cells at DCCC were converted to double-occupancy cells by the addition of 58 upper bunk beds. Although a bid was requested from a private professional contractor, Vince Bird Construction, DCCC did not accept this bid, and DCCC, in cooperation with the Douglas County Department of Public Properties, built the upper bunks on their own. The record shows that the county built the upper bunks based on the design submitted by the outside professional contractor.

The upper bunks were constructed of wood and attached to the wall with "all-threads," which are ⅝-inch or ¾-inch bolts that are 12 to 16 inches long. These bolts run through the concrete block walls of each cell into the upper bunk bed frame in both adjacent rooms. The frame of each bunk was enclosed in plywood, and the plywood was glued to the bunk bed frames with "PL400," an industrial-strength compound.

In most cells at DCCC, including room 8 of module F, in addition to the beds, there is a sink, a toilet, a desk, and a stool in front of the desk which is bolted to the floor. The upper bunk is approximately 53 to 54½ inches off the ground, while the lower bunk is approximately 19 to 20 inches high. Typically, the inmates use the bottom bunk, the desk, or the stool to access the upper bunk. The desks are 29 to 30 inches high, while the stools are 18 or 19 inches high. The stools are approximately 9 to 10 inches away from the bunk beds. Evidence produced at the hearing indicated that a faceplate was bolted either to the wall near the beds or to the beds themselves. The plate allows an inmate to step up on the edge of the plate toward the wall and get into the upper bunk with safety. The evidence showed that DCCC did not install stepladders or moveable stools in the cells to assist inmates in reaching the upper bunk for fear that the inmates would use such items as weapons or as a means to commit suicide.

William McPhillips, the deputy warden of administration at DCCC at the time of Nichols' accident, testified that he had been employed at the facility since 1978 and that since that time, an inmate had fallen from his bunk a couple of times at most. McPhillips stated that there had been no problems between inmates potentially caused by one inmate's using another inmate's lower bunk to gain access to his upper bunk.

The evidence shows that DCCC is inspected by the Jail Standards Board on a yearly basis and that DCCC was in full compliance during 1990 and 1991. The Jail Standards Board did not comment on the construction of bunk beds or require that the bunk beds be inspected on a routine basis. Specifically, regarding inspections of inmates' cells, the Standards for Jail Facilities, 81 Neb. Admin. Code, ch. 6, § 003.02A (1987) states, "Facility employees shall carefully inspect cells, cell doors, bars, windows, and doors leading into and out of housing areas daily to insure that all are in proper and safe working order."

Regarding the inspection of the windows, jail personnel testified that they would have to place their weight on the upper bunk to check the window. One corrections officer testified that it is not possible to reach the windows without placing some pressure on the top bunk. DCCC records show that the windows in Nichols' room were checked on December 29 and 31, 1990, and January 1, 1991.

Nichols testified that he had been incarcerated in DCCC as a pretrial detainee from August 24, 1990, to April 11, 1991. Nichols testified that initially he was housed in room 13 of module F and that around Thanksgiving weekend of 1990, he was transferred to room 8 of module F and assigned to the top bunk. Nichols testified that on January 3, 1991, at about 1:30 a.m., he got up to use the restroom and that when he attempted to get back into bed, he used the stool by the desk to pull himself up to the upper bunk. Specifically, Nichols testified that he stepped up on the stool, leaned forward, braced himself, turned, and attempted to place his "rear end onto the bunk," essentially doing a "sort of a half pirouette" to get into the bed. Nichols testified that as he did so, his bed gave way and he fell onto the ground. Nichols testified that he was knocked unconscious from the fall and that when he woke up in the hospital, he felt pain in

the left side of his head and the right side of his lower back. Nichols testified that during the approximately 5 weeks he used the top bunk, he never noticed that his bed was loose.

Nichols called an expert in design and renovation of correctional facilities, Randall Atlas, who testified on Nichols' behalf by videotape. The videotaped testimony and a transcription thereof are in the record on appeal. Atlas testified that the top bunks should have been constructed of steel or metal, not wood. In particular, Atlas testified that the fact that no lock washers were used when bolting the bed to the steel rod was substandard construction. Atlas stated that DCCC did not provide an adequate means for the inmates to access the upper bunks. Atlas discussed the advisability of alternate methods of access to bunk beds, including stools and ladders. Atlas also recommended that DCCC attach a "solid plate" or "something fairly comparable in wood" to either the lower bunk bed or to the wall for the inmates' use in getting to the upper bunk. He did not opine that the existing faceplate was inadequate, as he did not appear familiar with its existence. On cross-examination, Atlas acknowledged that although he had reviewed documents forwarded by Nichols' counsel, he had not personally viewed any of the cells at DCCC, inspected the bunk beds, or talked to any of DCCC's employees or to Nichols. Additionally, Atlas admitted that he did not know whether the stools by the desk were moveable or fixed. Atlas did not know how high the stools were or the height of the beds. Atlas hypothesized that the stools in the cells were 12 to 18 inches from the bed whereas the evidence shows that the stools are 9 to 10 inches away.

Ralph Hilt, the DCCC employee who repaired Nichols' bunk after Nichols' fall on January 3, 1991, testified that upon checking the upper bunk in room 8 of module F, the upper bunk looked fine, but that when pressure was applied to the bed, he found that the upper bunk was loose on the left corner, with approximately a ½-inch or ¾-inch movement on the left-hand side. Hilt testified that he was aware that two or three other bunks built like Nichols' had become loose and had required repair. Hilt was not asked whether any inmates had been injured because of the loose bunks. Specifically, the evidence shows that most recently, DCCC's employees had repaired the upper

bunk in room 1 of module D on December 9, 1990, because the top bunk had become loose from its mounting. However, unlike the upper bunk in room 8 of module F, the upper bunk in room 1 of module D is not connected to the bunks in the adjacent rooms, but, rather, connected only to one other upper bunk bed because room 1 of module D is at the end of a row.

Regarding room 8 of module F, Donald Howland, the inmate who was assigned to the upper bunk in room 8 of module F before Nichols, gave testimony in a deposition. Howland testified that while he resided in room 8 of module F, the upper bunk was very unstable and loose, not just on the left side, but on both the left-hand and the right-hand sides. Howland testified that he brought the condition of the upper bunk to the attention of the guards on several occasions and that DCCC engineers had inspected the bunk, but did not repair the upper bunk before he left the room. There was no evidence of Howland's complaints in any of DCCC's records, nor is there any record of any repair work done on the upper bunk in room 8 of module F prior to Nichols' accident. Evidence on this record indicates that as a general rule, maintenance personnel at DCCC did repair work in a timely manner, shortly after being notified of a maintenance problem.

In a seven-page order dated October 31, 1996, the district court dismissed Nichols' petition with prejudice. The district court concluded that DCCC was not liable because (1) the design and installation of the upper bunk beds met the standard of care for correctional facilities, (2) DCCC's inspection of the inmates' beds met or exceeded the standard of care for correctional facilities, (3) neither Nichols nor DCCC was aware of the fact that Nichols' bed was defective in any way, and (4) DCCC's decision not to place footstools or ladders on the bunk beds met or exceeded the standard of care applicable to correctional facilities. Nichols appeals.

### ASSIGNMENTS OF ERROR

Essentially, Nichols argues that the trial court erred in failing to determine (1) that DCCC was negligent in designing, installing, maintaining, and repairing the upper bunk in room 8 of module F prior to Nichols' fall from the upper bunk on

January 3, 1991, and (2) that DCCC knew or should have known that Nichols' bunk bed was in need of repair prior to January 3.

## STANDARD OF REVIEW

■ In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the verdict, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Wasiak v. Omaha Pub. Power Dist.*, 253 Neb. 46, 568 N.W.2d 229 (1997).

■ On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997).

## ANALYSIS

On appeal, Nichols argues that the trial court erred in failing to determine that DCCC was negligent in designing, installing, maintaining, and repairing the upper bunk in room 8 of module F prior to Nichols' fall from the upper bunk on January 3, 1991, and that DCCC knew or should have known that Nichols' bunk bed was in need of repair prior to January 3. DCCC argues that the trial court's factual findings were not clearly wrong and that the district court's order should be affirmed. After considering the evidence in a light most favorable to DCCC and resolving every controverted fact in DCCC's favor, we find that the trial court's findings of fact were not clearly wrong and affirm the decision of the district court.

In its order dated October 31, 1996, the trial court made lengthy and detailed findings. The trial court summarized the testimony of the various witnesses. Thus, for example, with respect to Howland's testimony, the trial court summarized the evidence given by Howland and stated, inter alia, that the testimony of Howland was not useful regarding Nichols' issues. Similarly with respect to Nichols' expert, Atlas, the trial court summarized the opinions Atlas rendered regarding construction

and maintenance and Atlas' opinion that footstools or ladders should have been provided to the inmates. Atlas also recommended the attachment of a "solid plate" or "something fairly comparable in wood," but did not comment on whether or not the existing faceplate was inadequate. The trial court observed that Atlas did not mention any treatises or other scholarly works in connection with his opinions but did not reject Atlas' opinions on that basis. The trial court agreed with Atlas in observing that "no doubt . . . a stronger bed could have been constructed, [but] I cannot say that the DCCC was negligent in failing to install stronger frames in this instance." In summarizing other testimony, the trial court noted that the evidence presented by the county showed that "over a 15-year period, no structural failures had occurred."

A review of the record shows there is evidence that the bunk beds at DCCC were well constructed, were secured by connecting the bunk beds to other bunk beds in adjacent rooms, and were assembled using PL400, an industrial-strength compound, and that their design was based on the drawings submitted by outside professionals. Evidence shows that the inmates were provided several means to access their upper bunks, including the desk, the stool, the lower bunk, and a faceplate attached either to the wall near the beds or to the beds themselves. There is convincing evidence that DCCC did not install stepladders or moveable stools to access the beds for valid safety and security reasons.

Although Nichols contends that DCCC should have known that his bunk bed was loose, he testified that he never noticed that his bunk was loose prior to January 3, 1991. Although Atlas opined that fights might occur if an inmate used another inmate's bed as a stepping stool, evidence produced by DCCC shows that inmates routinely did so without creating problems. Similarly, although there is no specific rule mandating that DCCC inspect the bunk beds on a routine basis, the evidence shows that DCCC employees of necessity checked the inmates' beds and the beds' stability while checking the adjacent windows in the inmates' cells. In this regard, we note that DCCC employees testified that they were unable to check the windows without placing some force or some of their weight on the upper

bunk beds. The record shows that the windows in room 8 of module F were checked on December 29 and 31, 1990, and January 1, 1991. Additionally, since the upper bunk beds were installed in the early 1980's, very few accidents have occurred. McPhillips testified that at most, two inmates have fallen off their beds since he started to work at DCCC in 1978. McPhillips did not state the cause of these accidents.

▪▪▪ To the extent that expert testimony was required by Nichols to establish a lack of care by DCCC and without commenting on the required standard of care, Nichols produced Atlas, who was qualified as an expert and rendered opinions summarized above in this opinion. Taking the trial court's opinion in its entirety, it is clear from the trial court's findings and conclusions that the trial court did not credit Atlas' opinions and that his opinions were outweighed by other evidence presented by the county, inter alia, the testimony summarized above and the bunk bed design, which was based on the design submitted by the outside professional contractor. In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997). Similarly, determining the weight that should be given expert testimony is uniquely in the province of the fact finder. *Id.* Under *Aken v. Nebraska Methodist Hosp.*, 245 Neb. 161, 511 N.W.2d 762 (1994), where the appellate court reviews videotaped testimony and evidence, and the standard of appellate review is not de novo, the appellate court is not free to substitute its view of the evidence for that of the trier of fact. Thus, in the instant case, regardless of whether or not the appellate court may have given the videotaped testimony of Atlas more weight than did the trial court, this court cannot say as a matter of law that the trial court's determination which, after reviewing all the evidence, fails to find Atlas' opinions persuasive, is clearly wrong.

## CONCLUSION

Based on the evidence before it, the district court concluded Nichols did not establish liability. We find no reversible error.

AFFIRMED.

IRWIN, Judge, dissenting.

The first question which must be answered in this appeal is, What is the standard of care applicable to the design and installation, in a maximum security correctional facility, of a retrofitted top bunk hanging more than 4 feet above a concrete floor? The majority opinion fails to address this question. The majority states, "To the extent that expert testimony was required by Nichols to establish a lack of care by DCCC *and without commenting on the required standard of care*, Nichols produced Atlas . . . ." (Emphasis supplied.) The majority further states that "it is clear from the trial court's findings and conclusions that the trial court did not credit Atlas' opinions *and that his opinions were outweighed by other evidence presented by the county* . . . ." (Emphasis supplied.)

I think the majority makes an error that is not inconsequential in not "commenting on the required standard of care." I conclude this because the trial court used the wrong standard of care in rendering its decision and erroneously discounted the only expert opinion regarding the proper standard of care simply because Atlas did not state that he relied upon any particular treatise or book in rendering his opinions. The majority also incorrectly states that "[Atlas'] opinions were outweighed by other evidence presented by the county." It is undisputed that the county presented *no* expert testimony to rebut Atlas and, to borrow from the majority's language, "[t]o the extent that expert testimony was required," Nichols provided the only expert testimony in this record. The majority does not and cannot indicate what evidence was presented by the county to outweigh Atlas'. opinions because there was none.

It is axiomatic that in order to succeed in an action based on negligence, the plaintiff must establish the defendant's duty not to injure the plaintiff, breach of that duty, proximate causation, and damages. *Ackles v. Luttrell*, 252 Neb. 273, 561 N.W.2d 573 (1997). The instant case was bifurcated, and therefore the sole issue to be decided at this point in the legal process is that of liability. Trial on the issue of liability involves the elements of duty not to injure the plaintiff and breach of that duty. See *Scholl v. County of Boone*, 250 Neb. 283, 549 N.W.2d 144 (1996). In a negligence case, the duty not to injure encompasses

the concept of standard of care. "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 at 356 (5th ed. 1984).

Expert testimony is necessary to establish the standard of care in cases in which the trier of fact is faced with matters requiring special knowledge or skill on subjects which are not within the realm of the ordinary experience of people. The necessity of such testimony "arises from the fact that the judicial system is called upon to make determinations which require specialized knowledge in fields in which the trier of fact is ignorant or relatively so." *Halligan v. Cotton*, 193 Neb. 331, 340, 227 N.W.2d 10, 15 (1975). It is interesting to note that in the present case, the county first contacted an architect to design these bunks but then elected to do the job itself. The law is clear that when a nonprofessional decides to perform services in professional areas, such as architecture or construction herein, that nonprofessional is required to exercise the same level of skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. Restatement (Second) of Torts § 299A (1965). Although there is an exception to this rule noted in the Restatement, it is not pertinent to the facts of this case. The county chose to perform the services of an architect and builder and was therefore bound to perform according to the standards applicable to such professions.

The trial judge, according to his multipage order, found the following proposition of law to be controlling on the issue of what standard of care is applicable here: " '[A] jailer has a duty to exercise that degree of care necessary to provide reasonably adequate protection for his prisoners.' Daniels v. Anders[e]n, 195 Neb. 95, 98, [237 N.W.2d 397, 400] (197[5]), quoting 60 Am.Jur.2d Penal and Correctional Institutions §17 [(1972)]; Restatement of Torts 2d §320 [(1965)]." In other words, the trial judge found that the standard of care to be applied to the design and installation issues in this case is one of ordinary reasonableness, capable of ascertainment without the assistance of expert testimony. As such, the trial court applied the wrong

standard of care in assessing Nichols' claim and proof, and was clearly wrong in concluding that Nichols failed to meet his burden of proof.

The *Daniels* case cited by the trial court involved a plaintiff-inmate who was attacked by a fellow inmate while locked in a "drunk tank." The negligence claim in *Daniels* was distinguishable from the issues dealt with in the case before us. I would agree that an act of negligence involving personal violence among inmates may not require expert testimony to establish the standard of care. However, the case at hand involves design and installation of a retrofitted top bunk that must be suspended from the wall of a jail. While regrettably we all may have some experience with physical assault, either actual or vicarious, few of us are familiar in any manner with designing and building furniture for a maximum security jail. I must respectfully disagree with the majority opinion which tacitly endorses the conclusion of the trial court that expert testimony was unnecessary.

The Nebraska Supreme Court has held on several occasions that in a claim for professional negligence, the standard of care must be established by expert testimony, and failing such expert testimony, a prima facie case of negligence has not been established. See, e.g., *Overland Constructors v. Millard School Dist.*, 220 Neb. 220, 369 N.W.2d 69 (1985). Because the county was performing a professional service, in this case design and installation, the county is held to the same standard as a professional in the fields of architecture and construction. As such, this case should be treated like any other professional negligence case, and expert testimony is needed to establish the standard of care.

Nichols called Atlas via videotaped deposition to provide expert testimony on the standard of care. To determine whether Nichols, through Atlas' testimony, succeeded in setting forth a prima facie case, it is necessary to review Atlas' qualifications as an expert, as well as his testimony regarding the standard of care applicable to the design and installation of this bunk bed. Atlas has bachelor's degrees in architecture and criminal justice from the University of Florida and the University of South Florida, respectively. He has a master's degree in architecture from the University of Illinois. Atlas also earned a doctorate in criminology from Florida State University. The record is undis-

puted that these are the highest credentials in the country regarding design of correctional facilities.

As part of his architectural education and experience, Atlas studied design and construction of both new and remodeled correctional facilities. While in college, Atlas worked for and did an architectural internship at the Florida Department of Corrections. His work for the Florida Department of Corrections included the preparation of documents for retrofitting existing buildings and housing units. During this time, he gained experience planning and constructing inmate cells in correctional facilities.

After his college work, Atlas was employed by a national architectural firm, specializing in jail and prison construction. His position involved the design of large prison facilities in California and architectural programming of several new jails. Atlas next worked for an architectural firm in Coral Gables, Florida, that had recently obtained a commission for a $44 million correctional facility in Dade County, Florida. He worked with a team responsible for the architectural program and design for bunking within this 1,000-bed facility. Later, Atlas started his own company and began doing work for the National Institution of Corrections, which is part of the Department of Justice. He served as a technical consultant and participated as a trainer in a program for the planning of new institutions. Atlas also worked as an onsite technical assistant consultant where he was sent around the country to look at jails experiencing overcrowding. He assisted in planning architectural renovations to deal with overcrowding.

As part of his work, Atlas has instructed county officials and other correctional or jail administrators regarding their standard of care to be followed in their endeavors. He testified that the American Corrections Association was generally regarded as the "national industry standard." Atlas has also published papers on correctional architecture, taught at various universities regarding criminal justice issues, and testified as an expert witness in other cases.

In preparation for his testimony, Atlas reviewed various documents, including depositions, floor plans, cell designs and layouts, sketches, correspondence, and pleadings, all provided to

him by counsel. Atlas also testified that he reviewed the American Corrections Association Adult Detention Center standards.

Atlas concluded that the bunk bed in the present case was designed and constructed in such a manner that there existed unacceptable flexibility and movement and that the bed was anchored to the wall in a manner that did not provide sufficient rigidity to prevent working itself loose from the wall. He also felt it was substandard as a construction technique to fail to use "lock washers" when bolting the bed to the steel "all-threads." Specifically, he stated:

> [Nichols' counsel:] In terms of the wooden bunk itself, your criticism as to the way it's attached goes to the lack of a lock washer and the spacing that is exhibited and the failure to have a method of rigid attachment to the side walls such as a weld?
>
> [Atlas:] That is correct.
>
> . . . .
>
> . . . And in addition to that, that they didn't provide a proper anchoring device to anchor the bolts to the wood. We have a connection between two different materials of steel to wood, and they could have used a sleeve or some kind of device that would have allowed anchoring and transferring the weight from the steel rod to the wood in a better manner.
>
> [Nichols' counsel:] Then it is your opinion that eventually these bunks were going to come loose and that this was an accident waiting to happen?
>
> [Atlas:] Yes, sir.

Contrary to the majority's conclusion, the record does not establish that "a faceplate was bolted either to the wall near the beds or to the beds themselves [to reach] the upper bunk *with safety*." (Emphasis supplied.) The testimony relied upon by the majority in this regard, which was given by the coordinator of public properties, closely follows testimony by the same witness that "the planned method of ingress and egress from the upper bunk" was "[j]ust to step on the edge of the lower bunk." The witness indicated that there was a *faceplate* on the bed, not a plate designed *for use in getting to the upper bunks*.

Finally, Atlas testified that there was no adequate, safe means of ingress and egress to the upper bunk. Atlas specifically testified that using the lower bunk as a step was unsafe and that the stool was too far from the bunks to be used safely. Additionally, Atlas' failure to specifically "opine that the existing faceplate [on the bed] was inadequate [as a means of ingress and egress]," as noted by the majority, does not represent a tacit admission of the plate's adequacy. Rather, from my review of the record, it is a result of the fact that no one asked Atlas about the faceplate at trial. This is likely a direct result of the fact that no one has ever represented that the faceplate was to serve as a means of accessing the upper bunk.

The trial court's order stated that Atlas testified:

[T]he design and maintenance of these bunks, and Nichols' bunk in particular, was below the standard of care for penal institutions. The wood frame construction was improper ("a Mom and Pop" job). (Stronger) Metal frames should have been used; and the frames should have been welded or lock washered to the walls. Foot stools, ladders or other access devices should have been provided.

The order went on to state:

As to the design critique, Atlas did not name any architectural guide or structural authority, either within or without the correctional industry, which would, as a matter of due care, specify wood rather than metal construction. No treatise, scholarly work, or accepted source was mentioned in support of this criticism. . . . A similar observation applies to Atlas' complaint that the frames should have been welded or lock washered to the walls. While I have no doubt that a stronger bed could have been constructed, I cannot say that the DCCC was negligent in failing to install stronger frames in this instance.

The above-quoted language from the trial court's order is significant in two respects. First, it is apparent that the court concluded that Atlas' opinion was that the design and installation of the bunk did *not* meet acceptable professional standards. This is a factual conclusion of the trial court that, as the majority has noted, we are not free to dispute on appeal unless it is clearly erroneous. A review of the bill of exceptions shows that this fac-

tual determination of the judge is supported by the record, and we are obliged to accept it.

The second significant aspect of the trial court's language quoted above is the court's conclusion that because no treatise, book, publication, or guide was relied on by Atlas in forming his opinion, the court was free to totally disregard it. While oftentimes experts do rely on such sources for their opinion, nothing in statute or case law *requires* reliance on such materials in every instance. If such were the case, the author of the most learned treatise on a subject would be precluded from testifying until a publisher was first found to put the information in print. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Neb. Rev. Stat. § 27-702 (Reissue 1995). Atlas was qualified as an expert, he possessed a sufficient and proper foundation or factual basis for his opinion, and his testimony was necessary for the trier of fact to establish and evaluate the standard of care in this case.

Although expert testimony was necessary for Nichols to establish the standard of care in order to prove a prima facie case, the testimony of Atlas satisfied that requirement. The county presented absolutely no expert testimony to rebut the standard of care as ably presented by Atlas. The trial court was clearly wrong in finding Atlas' opinion was inadequate simply because it was not based on a treatise, a scholarly work, or an accepted source.

Having concluded that expert testimony was necessary to establish the standard of care owed to Nichols, that Nichols offered sufficient expert testimony to establish the standard of care, and that the county offered no expert testimony to rebut Atlas, the final question is whether the trial court erred in finding that Nichols did not establish liability. The answer is and must be "Yes." Not only did the county fail to rebut the standard of care as articulated by Atlas, it also failed to rebut the design and installation breaches laid out by him. These breaches include the failure to design and construct the bunk with sufficient rigidity to prevent the bed from working itself loose from

the wall, the failure to use lock washers when bolting the bed-frame to the "all-threads," and the failure to provide a safe means of access to the upper bunks. In fact, the county does not dispute that these deficiencies existed but contends that they simply do not fall below the standard of care of how a *reasonable* person would have designed and installed the retrofitted bunk. This stance by the county is as incorrect as the trial court's conclusion because it assumes a standard of care of ordinary reasonableness, rather than the applicable higher standard of care required of a professional. The law is clear that when a person decides to perform services in professional areas such as architecture or construction, that person is required to exercise the skill and knowledge normally possessed by members of that profession or trade.

The trial court's failure to use the appropriate standard of care renders its conclusions clearly wrong. The judgment should be reversed and the case remanded with directions to enter judgment in favor of Nichols on the issue of liability and proceed to trial on the issues of proximate cause and damages.