Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:09 PM CDT

Joshua M. et al., appellants, v.
State of Nebraska et al., appellees.

___ N.W.3d ___

Filed May 3, 2024.    No. S-21-1037.

1. **Tort Claims Act: Appeal and Error.** Whether a claim is precluded by an exemption under the State Tort Claims Act presents a question of law.
2. **Jurisdiction.** Subject matter jurisdiction is a question of law.
3. ____. When a jurisdictional question does not involve a factual dispute, the issue is a matter of law.
4. **Judgments: Appeal and Error.** An appellate court reviews questions of law independently of the lower court's conclusion.
5. **Immunity.** Under the common-law doctrine of sovereign immunity, a state's immunity from suit is recognized as a fundamental aspect of sovereignty.
6. **Jurisdiction: Immunity.** The doctrine of sovereign immunity is, by its nature, jurisdictional, and presents a question of subject matter jurisdiction that courts cannot ignore.
7. **Jurisdiction.** Questions regarding a court's subject matter jurisdiction should be resolved as a threshold matter before an examination of the merits.
8. **Constitutional Law: Legislature: Immunity.** The sovereign immunity of the State and its political subdivisions is preserved in Neb. Const. art. V, § 22, and this constitutional provision permits the State to lay its sovereignty aside and consent to be sued on such terms and conditions as the Legislature may prescribe.
9. ____: ____: ____. Because Neb. Const. art. V, § 22, is not self-executing, no suit may be maintained against the State or its political subdivisions unless the Legislature, by law, has so provided.
10. **Jurisdiction: Legislature: Immunity: Waiver.** Absent legislative action waiving sovereign immunity, a trial court lacks subject matter jurisdiction over an action against the State.

11. **Constitutional Law: Legislature: Claims.** The authority to determine which claims can be brought against the State, and which cannot, is a power the Nebraska Constitution expressly placed in the legislative branch.

12. **Courts: Immunity: Waiver: Equity.** The judiciary does not have the power to waive sovereign immunity regardless of the equities of the case.

13. **Political Subdivisions Tort Claims Act: Tort Claims Act: Legislature: Immunity: Waiver.** Through the enactment of the State Tort Claims Act and the Political Subdivisions Tort Claims Act, the Legislature has waived sovereign immunity with respect to some, but not all, types of tort claims.

14. **Political Subdivisions Tort Claims Act: Tort Claims Act: Immunity: Waiver.** Both the State Tort Claims Act and the Political Subdivisions Tort Claims Act contain exemptions to the limited waiver of sovereign immunity, and those exemptions describe the types of tort claims for which the State and its political subdivisions retain sovereign immunity.

15. **Political Subdivisions Tort Claims Act: Tort Claims Act: Dismissal and Nonsuit: Jurisdiction: Immunity: Waiver.** When a claim falls within an exemption under the State Tort Claims Act or the Political Subdivisions Tort Claims Act, sovereign immunity for the claim has not been waived and the proper remedy is to dismiss the claim for lack of subject matter jurisdiction.

16. **Statutes: Immunity: Waiver.** Statutes purporting to waive the protection of sovereign immunity are to be strictly construed in favor of the sovereign and against waiver.

17. **Immunity: Waiver.** In order to strictly construe statutes against a waiver of sovereign immunity, courts must read statutory exemptions from a waiver of sovereign immunity broadly.

18. **Political Subdivisions Tort Claims Act: Tort Claims Act: Assault.** Because the exemption for claims arising out of assault or battery is the same under the State Tort Claims Act and the Political Subdivisions Tort Claims Act, cases construing the State Tort Claims act exemption are applicable to cases construing the Political Subdivisions Tort Claims Act exemption and vice versa.

19. ____: ____: ____. Under the State Tort Claims Act and the Political Subdivisions Tort Claims Act, a plaintiff cannot avoid the reach of the exemption for any claim arising out of assault or battery by framing his or her complaint in terms of negligent failure to prevent the assault and battery. The exemption does not merely bar claims for assault or battery; in sweeping language, it excludes any claim arising out of assault or battery.

20. ____: ____: ____. Under the State Tort Claims Act and the Political Subdivisions Tort Claims Act, the exemption for claims arising out of assault or battery applies whenever an assault is essential to the claim, and it bars claims against the government which sound in negligence but stem from an assault or battery.

21. ____: ____: ____. Under the State Tort Claims Act and the Political Subdivisions Tort Claims Act, the exemption for claims arising out of assault or battery encompasses claims that would not exist without an assault or battery and claims that are inextricably linked to an assault or battery.

22. **Political Subdivisions Tort Claims Act: Tort Claims Act: Assault: Damages.** No matter how a tort claim against the government is framed, and regardless of the assailant's employment status, when a claim seeks to recover damages for personal injury or death stemming from an assault or battery, it necessarily arises out of assault or battery and is barred by the exemption for claims arising out of assault or battery under the State Tort Claims Act and the Political Subdivisions Tort Claims Act.

Appeal from the District Court for Richardson County: Julie D. Smith, Judge. Affirmed in part, and in part vacated and remanded with directions.

Diana J. Vogt and James L. Schneider, of Sherrets, Bruno & Vogt, L.L.C., for appellants.

Douglas J. Peterson, Attorney General, and Christopher A. Felts for appellee State of Nebraska.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Papik, JJ., and Strong and Smith, District Judges.

Per Curiam.

This is an appeal under the State Tort Claims Act (STCA),[1] and the threshold jurisdictional issue is whether the plaintiffs' claims fall within the scope of the STCA's exemption for "[a]ny claim arising out of assault [or] battery"[2] and thus

[1] See Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2014 & Cum. Supp. 2022).

[2] § 81-8,219(4).

are barred by the State's sovereign immunity. Our cases have sometimes been inconsistent in construing and applying this exemption, and this appeal highlights inconsistency between our 1977 opinion in *Koepf v. County of York*[3] and our 2020 opinion in *Moser v. State*.[4] We discuss the reasoning and holding of both cases later in our analysis.

The facts of this case are undeniably tragic. In 2015, three siblings who spent much of their youth in the Nebraska foster care system filed suit against their former foster parent for intentional assault and battery, alleging the foster parent physically and sexually assaulted them. In the same action, the siblings sued the State of Nebraska and the Nebraska Department of Health and Human Services (collectively DHHS) under the STCA, alleging DHHS was negligent in recommending and supervising their placement and in failing to remove them from such placement when DHHS knew or should have known they were being physically and sexually abused. In presenting these tort claims against DHHS, the siblings generally relied on the reasoning and holding of *Koepf.*

In 2021, the action was tried to the bench. After the siblings presented their case in chief, DHHS moved for a directed verdict on the ground of sovereign immunity, relying on *Moser* to argue that the siblings' claims fell within the STCA's exemption for "[a]ny claim arising out of assault [or] battery."[5] The district court rejected DHHS' jurisdictional argument based on *Moser* and concluded that *Koepf* remained the controlling law as to the siblings' tort claims against DHHS.

At the conclusion of trial, the court entered judgment in favor of the siblings and against their former foster parent in the collective sum of $2.9 million. But the court found the evidence was insufficient to prove DHHS breached its duty of care to the siblings and thus entered judgment in favor

---

[3] *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977).

[4] *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020).

[5] § 81-8,219(4).

of DHHS. The siblings appeal, challenging only the entry of judgment in favor of DHHS.

We moved this appeal to our docket on our own motion to address the tension between *Koepf* and *Moser* as it regards the proper construction and application of the STCA exemption for "[a]ny claim arising out of assault [or] battery."[6] As we will explain, the siblings' negligence claims against DHHS fall squarely within the STCA's exemption for claims arising out of assault or battery and thus are barred by sovereign immunity. We must therefore vacate the judgment of the district court as to DHHS and remand the cause with directions to dismiss that defendant only. In all other respects, the district court's judgment is affirmed.

## I. BACKGROUND

Siblings Joshua M., Sydnie M., and Abigail S. were born between 1992 and 1995. In September 1995, their biological parents were involved in a serious car accident that left their mother severely disabled and unable to care for them. At the time, their father was deemed an unfit parent due to active alcoholism and instability in both employment and housing. As such, the county attorney of Richardson County, Nebraska, filed petitions alleging the siblings were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015). The siblings were adjudicated and became wards of DHHS in January 1996.

Joshua and Sydnie, who were toddlers at the time, were placed in foster care with Miles Ruch, Sr., and his wife, Carol Ruch. Abigail, then an infant, was initially placed in a different foster home, but joined her siblings in the Ruch home in June 1996. From 1996 to 1999, the siblings resided with the Ruchs as foster children. The Ruchs were appointed legal guardians for the siblings in 1999, and the siblings resided with the Ruchs under the guardianship until 2004.

---

[6] *Id.*

On the record before us, it is generally undisputed that from 1996 to 2004, all three siblings were subjected to frequent physical and sexual abuse in the Ruch home. There was conflicting evidence at trial as to whether such abuse was reported to DHHS and, if so, how DHHS responded. But the parties generally agree that in August 2004, Sydnie and Abigail each told Carol they had been sexually abused by Miles. Carol confronted Miles, who later confessed to police that he had sexually abused Sydnie and Abigail. Miles was arrested and charged with multiple counts of sexual assault of a child. The record suggests he was convicted pursuant to a plea agreement, has completed his sentences, and is required to register as a sex offender.

After Miles' arrest, the siblings remained in Carol's custody under the guardianship for several more months. Eventually, in response to reports that Carol had physically assaulted and injured Joshua, the Ruchs resigned as the siblings' guardians and the guardianship was terminated. The siblings were then placed back into DHHS custody.

In July 2005, based in part on recommendations from DHHS, the siblings were returned to the custody of their biological father. Several months later, their father was arrested for sexually assaulting Sydnie and Abigail.

### 1. Complaint and Motions
### for Summary Judgment

In December 2015, the siblings filed this tort action against Miles and DHHS. The operative complaint was styled as two causes of action—one against Miles and the other against DHHS. The siblings' biological father was not named as a defendant in this lawsuit.

As against Miles, the operative complaint asserted a claim of intentional assault and battery based on allegations that Miles repeatedly "physically and sexually abused" the siblings while they lived in the Ruch home between September 1995 and December 2004. Although Carol was deceased when the

lawsuit was filed, the operative complaint alleged that she "participated in and/or [was] aware of the abuse perpetrated by [Miles]."

As against DHHS, the operative complaint asserted a claim of negligence based on allegations that DHHS knew or should have known the siblings were being physically and sexually abused in the Ruch home and were likely to be sexually abused in their biological father's home, but that DHHS failed to protect the siblings from such abuse. The operative complaint alleged that DHHS breached its duty to protect the siblings from harm "while in foster care or other placement" by failing to properly screen and monitor their placement, by failing to remove them from the Ruch home, and by allowing them to be reunified with their biological father.

The operative complaint alleged that "[a]s a result of the assault and battery" by Miles, the siblings sustained damages, including physical and mental suffering and the cost of medical care and counseling. The complaint alleged identical damages as a result of DHHS' negligence.

Miles did not file a responsive pleading after being served. DHHS filed an answer, denying the allegations of negligence and alleging that the tort claims against DHHS were barred by the doctrine of sovereign immunity.

The siblings and DHHS filed competing motions for summary judgment, which the court granted in part and overruled in part. Because no challenge has been raised on appeal to the court's rulings on those motions, we do not elaborate further except to note that the court's rulings on summary judgment identified many disputed factual issues that remained for trial.

## 2. Trial and Motion for Directed Verdict

A bench trial was held over the course of several days in June 2021. All three siblings testified about the frequent physical and sexual abuse they endured in the Ruch home and how that abuse affected them physically and emotionally.

The siblings also adduced testimony from a former DHHS employee who was involved in supervising their case and from an expert who testified about the effects of physical and sexual abuse in children generally, and in the siblings specifically.

Joshua testified that when Miles was not traveling for work, Miles would beat the siblings on a daily basis. If the siblings threatened to call the police, Miles and Carol told them they would be "beat[en] . . . black and blue before [the police would] get here" and "the only thing [the police will] be picking up is a dead body." Joshua also testified about being sexually assaulted in the Ruch home; he said Miles told him that "it was either going to be me or . . . one of my sisters." Joshua believed he was protecting his sisters by enduring the sexual abuse, stating, "[I]f I was letting [Miles] do it to me [then] he wouldn't do it to them."

Sydnie testified that her earliest memory in life was being sexually assaulted by Miles, who would come into her bedroom every night he was home and molest her. Sydnie testified that when Miles was not sexually assaulting her, he was being physically violent. She testified that Carol was physically violent too and that Carol would hit the siblings with a board or "anything that she had around." Sydnie testified that Carol was also emotionally abusive, often calling Sydnie "ugly" and "stupid."

Abigail testified that she could not recall a time in the Ruch home when she was not being physically and sexually abused by Miles. She also described physical abuse by Carol, including a time when Carol disciplined her by pressing her hand onto an electric stove burner. Abigail testified that Carol was verbally abusive too, constantly calling the siblings "stupid, ugly, worthless."

After the siblings presented their case in chief, DHHS moved for a directed verdict on two grounds—one was jurisdictional, and the other was on the merits. First, DHHS argued

it had sovereign immunity because the siblings' claims fell within the STCA's exemption in § 81-8,219(4) for "[a]ny claim arising out of assault [or] battery." To support this argument, DHHS relied on the reasoning and holding in *Moser*,[7] an opinion released by this court in September 2020, which held that this exemption applied to bar a claim that the State negligently failed to protect an inmate from a fatal assault by his cellmate. The district court described DHHS' argument as "somewhat compelling," but ultimately declined to apply *Moser*, reasoning that *Koepf*[8] remained good law and that principles of vertical stare decisis compelled the court to follow *Koepf* in the instant case.

DHHS also moved for a directed verdict on the merits, arguing the siblings had failed to establish a prima facie case of negligence as against DHHS. The district court agreed in part and directed a verdict in favor of DHHS on the claim that DHHS was negligent in recommending reunification with the biological father, concluding the siblings had adduced no evidence suggesting DHHS had any reason to foresee that he would sexually abuse the siblings.

After DHHS presented its case in chief, the court took the matter under advisement pending consideration of written closing arguments.

### 3. Judgment

In an order entered December 19, 2021, the district court found the siblings had proved their claim of intentional assault and battery against Miles, but had failed to prove their claim of negligence against DHHS.

As against Miles, the court made express findings that the allegations of intentional assault and battery were true and that the "evidence at trial further showed that Miles

---

[7] *Moser, supra* note 4.

[8] *Koepf, supra* note 3.

personally inflicted abuse on all [the siblings] proximately causing them damages." The court entered a default judgment against Miles and in favor of the siblings in the total amount of $2.9 million.

Regarding the negligence claims against DHHS, the court began its analysis by quoting *Koepf* for the proposition that "[t]he placement in foster homes of defenseless children, and the supervision of their health and care, once committed to the custody of the welfare department must be accomplished with the reasonable care commensurate with the circumstances."[9] After reviewing the evidence adduced at trial, the court specifically found that DHHS "acted reasonably under the circumstances when [it] placed [the siblings] in foster care with the Ruchs." And it found that DHHS "acted reasonably under the circumstances in supervising and monitoring the foster care placement," reasoning:

The evidence of allegations regarding the supervision and monitoring of [the siblings] while placed in the Ruch foster home do[es] not rise to the level of a breach of the duty to reasonably supervise or monitor the placement. All reported allegations were investigated by DHHS, or [the siblings] have failed to meet their burden to establish the allegations were not investigated, and [DHHS] could not have investigated concerns that were never brought to [its] attention or which were not substantiated after initial investigation.

The district court also found that during the period when the siblings were under guardianship with the Ruchs, DHHS "did not breach any duty to report and investigate abuse which [it] had knowledge of and, if necessary, cause a complaint to be filed under Neb. Rev. Stat. § 43-706." Ultimately, the district court concluded the evidence showed that DHHS "did not have a reason to believe the Ruchs were improper persons to

9 *Koepf, supra* note 3, 198 Neb. at 73-74, 251 N.W.2d at 871.

have the care and custody of the [siblings] until the founded reports of [sexual abuse by Miles in] 2004."

The siblings filed this timely appeal, challenging several of the trial court's rulings regarding the negligence claims against DHHS. DHHS has not cross-appealed on any issue.

### 4. Supplemental Briefing

After the parties appeared for oral argument before this court, we requested supplemental briefs addressing whether any of the siblings' claims against DHHS fell within the statutory exemption for "[a]ny claim arising out of assault [or] battery."[10] We also requested supplemental briefing on whether the reasoning and holding of *Koepf*,[11] as it regards the assault and battery exemption, can be reconciled with the reasoning and holdings in *Moser*,[12] *Edwards v. Douglas County*,[13] *Williams v. State*,[14] and *Dion v. City of Omaha.*[15] We discuss the parties' supplemental briefing later in our analysis.

## II. ASSIGNMENTS OF ERROR

The siblings assign, consolidated and restated, that the district court erred in (1) granting DHHS a partial directed verdict on the claims involving placement with their biological father, (2) finding that DHHS did not breach its duty of care to the siblings while they were in foster care, and (3) excluding certain deposition testimony at trial. However, because we conclude the court lacked subject matter jurisdiction over the siblings' claims against DHHS, we do not reach the merits of any assigned error.

---

[10] § 81-8,219(4).

[11] *Koepf, supra* note 3.

[12] *Moser, supra* note 4.

[13] *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021).

[14] *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021).

[15] *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022).

## III. STANDARD OF REVIEW

[1] Whether a claim is precluded by an exemption under the STCA presents a question of law.[16]

[2,3] Subject matter jurisdiction is a question of law.[17] When a jurisdictional question does not involve a factual dispute, the issue is a matter of law.[18]

[4] An appellate court reviews questions of law independently of the lower court's conclusion.[19]

## IV. ANALYSIS

### 1. General Principles of Sovereign Immunity

[5-7] Under the common-law doctrine of sovereign immunity, a state's immunity from suit is recognized as a fundamental aspect of sovereignty.[20] The doctrine of sovereign immunity is, by its nature, jurisdictional,[21] and presents a question of subject matter jurisdiction that courts cannot ignore.[22] Questions regarding a court's subject matter jurisdiction should be resolved as a threshold matter before an examination of the merits.[23] We therefore begin our analysis by reviewing the principles of sovereign immunity that bear on subject matter jurisdiction in this case.

---

[16] See *Doe v. State*, 312 Neb. 665, 980 N.W.2d 842 (2022).

[17] *Id*.

[18] *Id*.

[19] *Id*.

[20] *Clark v. Sargent Irr. Dist*., 311 Neb. 123, 971 N.W.2d 298 (2022); *Burke v. Board of Trustees*, 302 Neb. 494, 924 N.W.2d 304 (2019); *State ex rel. Rhiley v. Nebraska State Patrol*, 301 Neb. 241, 917 N.W.2d 903 (2018).

[21] *Clark, supra* note 20; *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017).

[22] See, *Doe, supra* note 16; *Edwards, supra* note 13.

[23] See, *Doe, supra* note 16; *Lambert v. Lincoln Public Schools*, 306 Neb. 192, 945 N.W.2d 84 (2020).

[8-10] The sovereign immunity of the State and its political subdivisions is preserved in Neb. Const. art. V, § 22, which provides: "The state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." This constitutional provision permits the State to lay its sovereignty aside and consent to be sued on such terms and conditions as the Legislature may prescribe.[24] But we have long held that this constitutional provision is not self-executing and that no suit may be maintained against the State or its political subdivisions unless the Legislature, by law, has so provided.[25] As such, it is settled law that absent legislative action waiving sovereign immunity, a trial court lacks subject matter jurisdiction over an action against the State.[26]

[11,12] The authority to determine which claims can be brought against the State, and which cannot, has always been a power the Nebraska Constitution expressly placed in the legislative branch.[27] But at one point in our history, a slim majority of this court believed that if the Legislature had not acted to waive sovereign immunity for a particular category of tort cases, then this court could judicially abrogate sovereign immunity as it deemed appropriate in tort cases.[28] Not surprisingly, shortly after those opinions were released, the Legislature enacted the STCA and the Political Subdivisions

---

[24] *Burke, supra* note 20; *Gentry v. State*, 174 Neb. 515, 118 N.W.2d 643 (1962).

[25] *Doe, supra* note 16.

[26] *Id.*

[27] See Neb. Const. art. V, § 22.

[28] See, e.g., *Brown v. City of Omaha*, 183 Neb. 430, 434, 160 N.W.2d 805, 808 (1968) ("[w]e are convinced that the rule of governmental tort immunity is of judicial or common law origin, and that this court has power to modify it in the absence of legislative action to the contrary"). Accord, *Johnson v. Municipal University of Omaha*, 184 Neb. 512, 169 N.W.2d 286 (1969) (purporting to judicially abrogate sovereign immunity for tort claims arising out of physical condition on land).

Tort Claims Act (PSTCA).[29] Both acts expressly declared that "no suit shall be maintained against [the State or its political subdivisions] on any tort claim except to the extent, and only to the extent, provided" by the STCA or PSTCA.[30] Since the enactment of the STCA and the PSTCA, this court has unequivocally held that "[t]he judiciary does not have the power to waive sovereign immunity regardless of the equities of the case."[31]

[13-15] Through the enactment of the STCA and the PSTCA, the Legislature has waived sovereign immunity with respect to some, but not all, types of tort claims.[32] Both the STCA and the PSTCA contain exemptions to the limited waiver of sovereign immunity,[33] and those exemptions describe the types of tort claims for which the State and its political subdivisions retain sovereign immunity.[34] When a claim falls within an exemption under the STCA or the PSTCA, sovereign immunity for the claim has not been waived and the proper remedy is to dismiss the claim for lack of subject matter jurisdiction.[35]

[16] We have long held that statutes purporting to waive the protection of sovereign immunity are to be strictly construed

---

[29] See Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2012).

[30] § 81-8,209. Accord § 13-902.

[31] *McKenna v. Julian*, 277 Neb. 522, 529, 763 N.W.2d 384, 390 (2009), *abrogated in part on other grounds, Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010), *overruled, Davis, supra* note 21. Accord, *Edwards, supra* note 13, 308 Neb. at 280, 953 N.W.2d at 758 (recognizing "decisions on whether and how to limit the government's potential tort liability belong to the Legislature"); *Moser, supra* note 4, 307 Neb. at 31, 948 N.W.2d at 204 (recognizing it is "clear that it is the province of the Legislature, and not of this court" to decide whether STCA's exemption for assault or battery should be amended).

[32] See *id*. See, also, *Dion, supra* note 15; *Clark, supra* note 20; *Williams, supra* note 14.

[33] See §§ 13-910 and 81-8,219.

[34] See, *Doe, supra* note 16; *Edwards, supra* note 13.

[35] *Clark, supra* note 20; *Edwards, supra* note 13.

in favor of the sovereign and against waiver.[36] We explained the rationale for this rule in *Jill B. & Travis B. v. State*[37]:

> The principle of strict construction predated the [STCA] and has been consistently followed after its adoption. We had long said that statutes authorizing suit against the State are to be strictly construed, since they are in derogation of the State's sovereignty. Following adoption of the [STCA], we emphasized that statutes in derogation of sovereignty should be strictly construed in favor of the State, so that its sovereignty may be upheld and not narrowed or destroyed . . . . unless the intention of the Legislature to effect this object is clearly expressed. We also said that because the State has given only conditional consent to be sued and there is no absolute waiver of immunity by the State, requirements of the [STCA] must be followed strictly.

[17] We have repeatedly recognized that in order to "strictly construe [statutes] against a waiver of sovereign immunity, [courts] must read [statutory] exemptions from a waiver of sovereign immunity broadly."[38]

With these sovereign immunity and statutory construction principles in mind, we turn now to a review of our case law construing the specific statutory exemption at issue in this appeal.

---

[36] See *Moser, supra* note 4. See, also, *Catania v. The University of Nebraska*, 204 Neb. 304, 282 N.W.2d 27 (1979) (endorsing general rule that statutes in derogation of sovereign immunity should be strictly construed in favor of the State), *overruled on other grounds, Blitzkie v. State*, 228 Neb. 409, 422 N.W.2d 773 (1988).

[37] *Jill B. & Travis B. v. State*, 297 Neb. 57, 68-69, 899 N.W.2d 241, 251-52 (2017).

[38] *Moser, supra* note 4, 307 Neb. at 29, 948 N.W.2d at 203. Accord, *Brown v. State*, 305 Neb. 111, 939 N.W.2d 354 (2020); *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019); *Rouse v. State*, 301 Neb. 1037, 921 N.W.2d 355 (2019); *Amend v. Nebraska Pub. Serv. Commn.*, 298 Neb. 617, 905 N.W.2d 551 (2018); *Stick v. City of Omaha*, 289 Neb. 752, 857 N.W.2d 561 (2015).

## 2. Case law Construing Exemptions for
### Any Claim Arising Out of
#### Assault or Battery

[18] The Legislature enacted the STCA and the PSTCA in 1969, and it included in both acts an exemption from the limited waiver of sovereign immunity for "[a]ny claim arising out of assault [or] battery . . . ."[39] This quoted statutory language has remained unchanged since its enactment. Because the exemption for claims arising out of assault or battery is the same under the STCA and the PSTCA, our cases construing the STCA exemption are applicable to cases construing the PSTCA exemption, and vice versa.[40]

Over the years, this court has issued at least 10 published opinions expressly considering whether a particular claim was barred by the exemption for claims arising out of assault or battery.[41] Our opinions have not always applied consistent reasoning when construing this statutory provision.

Generally speaking, our opinions have followed one of two analytical approaches when construing the assault or battery exemption under the STCA and PSTCA. One approach originated with our 1977 opinion in *Koepf*,[42] and the other originated with our 2005 opinion in *Johnson v. State*.[43] In the sections that follow, we summarize the reasoning of those cases and the competing lines of authority that developed.

---

[39] See § 81-8,219(4). See, also, 1969 Neb. Laws, ch. 756.

[40] See, e.g., *Moser, supra* note 4.

[41] See, *Dion, supra* note 15; *Williams, supra* note 14; *Edwards, supra* note 13; *Moser, supra* note 4; *Rutledge v. City of Kimball*, 304 Neb. 593, 935 N.W.2d 746 (2019); *Britton v City of Crawford*, 282 Neb. 374, 803 N.W.2d 508 (2011); *McKenna, supra* note 31; *Doe v. Omaha Pub. Sch. Dist.*, 273 Neb. 79, 727 N.W.2d 447 (2007), *overruled in part, Moser, supra* note 4; *Johnson v. State*, 270 Neb. 316, 700 N.W.2d 620 (2005); *Koepf, supra* note 3.

[42] *Koepf, supra* note 3.

[43] *Johnson, supra* note 41.

We ultimately conclude that only the *Johnson* line of author-ity, which was expressly endorsed by this court in *Moser*,[44] is consistent with the settled duty to strictly construe waivers of sovereign immunity in favor of the sovereign and to broadly read exemptions from waivers of immunity. We therefore expressly overrule the *Koepf* line of authority and all cases applying similar reasoning.

#### (a) *Koepf* and Similar Cases

In *Koepf*, a minor child was fatally assaulted by his foster mother, and his estate sued the county welfare department to recover wrongful death damages under the PSTCA. The county argued that the estate's claim was barred by sovereign immunity under the PSTCA's exemption for "[a]ny claim arising out of assault [or] battery . . . ."[45] *Koepf* rejected that argument, calling it "demonstrably erroneous" and reasoning that the claim was "not based upon the alleged assault by the foster mother [but instead was] based upon the alleged negli-gence of the welfare department in the selection and supervi-sion of the foster home."[46]

In a series of cases following *Koepf*, this court allowed tort recovery under the STCA on facts similar to those con-sidered in *Koepf*.[47] The plaintiffs in these cases generally

---

[44] *Moser, supra* note 4.

[45] See § 13-910(7).

[46] *Koepf, supra* note 3, 198 Neb. at 72, 251 N.W.2d at 870.

[47] See, e.g., *Moore v. State*, 245 Neb. 735, 515 N.W.2d 423 (1994) (foster parents whose child was sexually molested by foster child sued DHHS under STCA for negligent foster care placement); *Haselhorst v. State*, 240 Neb. 891, 485 N.W.2d 180 (1992) (same); *Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 572 N.W.2d 790 (1998) (*Talle II*) (foster parent assaulted by foster child sued DHHS under STCA for negligent placement); and *Talle v. Nebraska Dept. of Soc. Servs.*, 249 Neb. 20, 541 N.W.2d 30 (1995) (*Talle I*) (same). See, also, *Teater v. State*, 252 Neb. 20, 559 N.W.2d 758 (1997) (former foster child sued State under STCA, alleging negligent supervision of foster placement resulted in sexual assault by foster parent; claim dismissed on statute of limitations ground).

sought to recover for assaults resulting from negligent foster care placement or supervision, but none of the opinions cited to or expressly relied on *Koepf*, and none addressed or analyzed sovereign immunity for claims arising out of assault or battery.

In the 2007 case of *Doe v. Omaha Pub. Sch. Dist.* (Doe),[48] we applied reasoning that was strikingly similar to that in *Koepf*, although our opinion did not cite to or discuss *Koepf*. In *Doe*, a student sued a school district under the PSTCA after being sexually assaulted by another student on school property during school hours. The school district argued the student's claim was barred by the PSTCA's exemption for claims arising out of assault or battery, but we disagreed, reasoning:

> [The student's] claim is not based upon the assault itself, and he could not prevail merely by proving that it occurred. Rather, he alleges that *before* the alleged assault, [the school district] breached an independent legal duty . . . to take reasonable steps to prevent foreseeable violence from occurring on its premises. . . . The claim therefore does not arise from an assault, but, rather, from an alleged negligent failure to protect a student from a foreseeable act of violence.[49]

As the above discussion illustrates, both *Koepf* and *Doe* involved claims that a political subdivision negligently failed to protect a child from a foreseeable assault, and both cases expressly concluded such claims fall outside the scope of the PSTCA's exemption for claims arising out of assault or battery. As we discuss next, most of our other cases construing the exemption have expressly rejected such reasoning.

### (b) *Johnson* and Similar Cases

In 2005, we decided *Johnson* and described that case as our first opportunity to "interpret the scope" of the STCA's

---

[48] *Doe, supra* note 41.

[49] *Id*. at 88, 727 N.W.2d at 456 (citations omitted) (emphasis in original).

exemption for claims arising out of assault or battery.[50] In *Johnson*, a prisoner sued the State under the STCA, alleging she had been sexually assaulted by a prison guard. The trial court concluded the claim arose out of an assault and was thus barred by sovereign immunity. The prisoner appealed, arguing that her claim did not arise out of assault, but, rather, arose from independent acts of governmental negligence that allowed the assault to occur, including negligent hiring and supervision of the prison guard.[51] *Johnson* soundly rejected this argument.

[19] Our analysis in *Johnson* began by reciting the principle that statutes purporting to waive the protection of sovereign immunity must be strictly construed in favor of the sovereign and against waiver. Applying that principle, *Johnson* held that even though the prisoner's claim had been framed as the negligent failure to prevent an assault, the claim fell squarely within the STCA exemption for claims arising from assault, reasoning:

"[A plaintiff] cannot avoid the reach of [the assault or battery exemption] by framing her complaint in terms of negligent failure to prevent the assault and battery. [The exemption] does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery."[52]

We have adhered to the reasoning in *Johnson* in a line of cases going back more than 20 years, including *McKenna*

---

[50] *Johnson, supra* note 41, 270 Neb. at 320, 700 N.W.2d at 623.

[51] *Johnson, supra* note 41.

[52] *Id*. at 320, 700 N.W.2d at 624 (emphasis in original), quoting *United States v. Shearer*, 473 U.S. 52, 105 S. Ct. 3039, 87 L. Ed. 2d 38 (1985).

*v. Julian*,[53] *Britton v. City of Crawford*,[54] *Rutledge v. City of Kimball*,[55] *Moser*,[56] *Edwards*,[57] *Williams*,[58] and *Dion*.[59]

In *McKenna*, *Britton*, and *Rutledge*, we considered personal injury and wrongful death claims brought under the PSTCA. *McKenna* involved a claim that police assaulted the plaintiff during an improper arrest. *Britton* involved a claim that police negligently shot and killed a burglary suspect. And *Rutledge* involved a claim that the plaintiff was physically attacked by an assailant whom the city negligently hired and supervised. In each of these cases, we recited and applied principles of strict construction and concluded that although the claims were framed in terms of negligence by the city, they nevertheless arose out of an assault or battery and thus fell within the scope of the PSTCA's exemption for assault or battery. As we explained in *Britton*:

> While other factors may have contributed to the situation which resulted in [the suspect's] death, but for the battery, there would have been no claim. No semantic recasting of events can alter the fact that the shooting was the immediate cause of [the suspect's] death and, consequently, the basis of [the plaintiff's] claim. Even if it is possible that negligence was a contributing factor to [the suspect's] death, the alleged negligence was inextricably linked to a battery. [This] suit is thus barred by the PSTCA.[60]

Similarly, in *Rutledge*, we said:

---

[53] *McKenna, supra* note 31.

[54] *Britton, supra* note 41.

[55] *Rutledge, supra* note 41.

[56] *Moser, supra* note 4.

[57] *Edwards, supra* note 13.

[58] *Williams, supra* note 14.

[59] *Dion, supra* note 15.

[60] *Britton, supra* note 41, 282 Neb. at 386, 803 N.W.2d at 518.

While [the plaintiff's] claim is characterized as one of negligence, no claim would exist but for [the] alleged battery. At oral argument, [the plaintiff] conceded that there never would have been a lawsuit had she not been assaulted. Thus, regardless of how the claim is pled, [the] claim is inextricably linked to a battery. Accordingly, the alleged negligence falls within the [PSTCA exemption for claims arising out of assault or battery] and the [defendant city] has not waived its sovereign immunity.[61]

Our 2020 opinion in *Moser* involved a wrongful death claim brought under the STCA by the estate of an inmate who was fatally assaulted by his cellmate while housed in a state prison facility.[62] The estate alleged the State was negligent in double-bunking the inmates and in failing to protect against a foreseeable assault. Applying principles of strict statutory construction, which we noted required a broad reading of the STCA exemption for "[a]ny claim arising out of assault,"[63] *Moser* affirmed the district court's dismissal of the action for lack of subject matter jurisdiction, concluding the claim fell squarely within the scope of the exemption.

*Moser* was also the first time that a majority of this court addressed historical tension in our case law construing and applying the assault or battery exemption under the STCA and PSTCA. *Moser* specifically discussed the reasoning of *Doe*,[64] describing that case as an "outlier"[65] in our sovereign immunity jurisprudence and holding:

Our decision in *Doe* was inconsistent with the approach we have taken in other cases as it relates to the "arising out of" language, and it does not comply

---

[61] *Rutledge, supra* note 41, 304 Neb. at 602, 935 N.W.2d at 753.

[62] *Moser, supra* note 4.

[63] § 81-8,219(4).

[64] *Doe, supra* note 41.

[65] *Moser, supra* note 4, 307 Neb. at 28, 948 N.W.2d at 202.

with our obligation to strictly construe the State's waiver of immunity. That decision was wrong, and as such, we overrule it.[66]

In overruling *Doe*, our opinion in *Moser* did not expressly mention *Koepf*.[67] But to the extent *Doe* and *Koepf* applied similar reasoning, *Moser* left little doubt that a majority of this court expressly disapproved of such reasoning.

[20-22] Since *Moser*, this court's cases have consistently applied principles of strict construction when determining whether a claim falls within the scope of the exemption for claims arising out of assault or battery.[68] In *Edwards*,[69] we held the exemption applied to bar a claim alleging that a county negligently handled calls to the 911 emergency dispatch service and that as a result, emergency personnel did not arrive in time to stop or prevent the plaintiff from being sexually assaulted. *Edwards* reviewed our prior decisions applying principles of strict construction and summarized the proper analytical framework to apply when determining whether a claim falls within the exemption for claims arising out of assault or battery:

> [O]ur cases have construed the [assault or battery] exemption to give it the full breadth demanded by its plain text and our canons of construction. We have said the exemption applies whenever an assault "is essential to the claim," and it bars claims against the government which "sound in negligence but stem from [an assault or] battery." We have also said the exemption encompasses claims that "would not exist without an assault or battery," and claims which are "'inextricably linked to [an

---

[66] *Id*. at 31, 948 N.W.2d at 202.

[67] See *Koepf, supra* note 3.

[68] See, *Dion, supra* note 15; *Williams, supra* note 14; *Edwards, supra* note 13.

[69] *Edwards, supra* note 13.

assault or] battery.'" All of these articulations speak to the same point: when a tort claim against the government seeks to recover damages for personal injury or death stemming from an assault, the claim necessarily "arises out of assault" and is barred by the intentional tort exemption under the PSTCA. The plain language of the exemption and our principles of strict construction require this result no matter how the tort claim has been framed and regardless of the assailant's employment status.[70]

We applied this framework again in *Williams*[71] to conclude the assault or battery exemption barred an inmate's claim under the STCA, alleging he was stabbed by a fellow inmate because the State negligently placed the inmates together in the same housing unit despite a "keep separate list."

And most recently, in *Dion*, we applied this framework to conclude the exemption barred a wrongful death claim against the city, alleging that police negligently shot and killed a film crew member while firing at a robbery suspect. *Dion* rejected the plaintiff's contention that the estate had "not sue[d] for battery, but, rather, sued for negligence,"[72] explaining that regardless of how the claim is framed by the plaintiff, courts will

> [look to] the gravamen of the complaint [to determine] whether the plaintiff has alleged an injury independent of that caused by the excluded acts, i.e., that the injury is linked to a duty to act that is entirely separate from the acts expressly excluded from the statutory waiver of sovereign immunity.[73]

---

[70] *Id*. at 277-78, 953 N.W.2d at 756.

[71] *Williams, supra* note 14, 310 Neb. at 589, 967 N.W.2d at 679 (internal quotation marks omitted).

[72] *Dion, supra* note 15, 311 Neb. at 545, 973 N.W.2d at 684.

[73] *Id*. at 541, 973 N.W.2d at 682.

### (c) Reconciling Case Law

Having summarized the two competing analytical approaches this court has used when construing and applying the exemption for claims arising out of assault or battery, we now consider the question we asked the parties to address in their supplemental briefing: whether the reasoning and holding in *Koepf*, as it regards the exemption for claims arising out of assault or battery, can be reconciled with the reasoning and holdings in *Moser*, *Edwards*, *Williams*, and *Dion*.[74]

DHHS argues that the reasoning in *Koepf* was "perfunctory" and contained "no analysis of the statutory text or the principles of sovereign immunity."[75] DHHS thus suggests that for the same reasons *Moser* concluded the sovereign immunity analysis in *Doe* was wrong and must be overruled, we should now overrule *Koepf*.

The siblings disagree and generally present two reasons why they think *Koepf* remains good law and should be followed here. First, they point out that when *Moser* overruled *Doe*, it did not cite to or expressly discuss *Koepf*. They note that *Moser* described *Doe* as an "outlier"[76] in Nebraska's sovereign immunity jurisprudence and that *Edwards* and *Williams* generally echoed that characterization.[77] The siblings infer, from our references to *Doe* as an outlier, that *Koepf* must "be an example of the proper construction the *Moser* [c]ourt sought to reinstate."[78] They are incorrect.

---

[74] See, *Dion, supra* note 15; *Williams, supra* note 14; *Edwards, supra* note 13, *Moser, supra* note 4; *Koepf, supra* note 3.

[75] Supplemental brief for appellees at 11.

[76] *Moser, supra* note 4, 307 Neb. at 28, 948 N.W.2d at 202.

[77] See, *Edwards, supra* note 13, 308 Neb. at 277, 953 N.W.2d at 756 (stating that "with the exception of *Doe*," our cases construe exemption for assault or battery "to give it the full breadth demanded by its plain text and our canons of construction"); *Williams, supra* note 14, 310 Neb. at 597, 967 N.W.2d at 684 (referring to *Doe* as "the only case decided in the past 20 years which had departed from" our strict construction precedent).

[78] Supplemental brief for appellants at 13.

*Doe* and *Koepf* both suffer from the same analytical failing; both relied on semantic reframing of the tort claims against the government in order to evade the exemption for claims arising out of assault or battery, and neither applied principles of strict construction to broadly construe the exemption. This court's failure to expressly cite or discuss *Koepf* in our prior cases does not reflect agreement with the reasoning or holding in *Koepf*; rather, it reflects a regrettable failure to look back far enough in our sovereign immunity jurisprudence to discuss the case at all.

Alternatively, the siblings argue that the reasoning in *Koepf* must have been correct because in several reported opinions in the 1990s, this court affirmed tort recovery under the STCA for plaintiffs who alleged they or their child had been assaulted as a result of DHHS' negligent foster care placement or supervision.[79] The siblings read too much into these cases. None of the cases expressly relied on *Koepf*, and none addressed the issue of sovereign immunity under the assault or battery exemption. Moreover, the opinions were decided during a period when this court treated exemptions under the STCA and PSTCA as affirmative defenses that were waived if not raised in a responsive pleading, rather than as a jurisdictional issue.[80] As such, it is likely the sovereign immunity issue was not addressed in those cases simply because it was not raised; the cases do not support the siblings' contention that the sovereign immunity analysis in *Koepf* was correct.

We agree with DHHS that *Koepf* basically endorsed the same faulty reasoning and semantic reframing relied upon in *Doe*, and for the same reasons we concluded in *Moser* that *Doe* must be overruled as wrongly decided, we likewise

---

[79] See, *Talle II, supra* note 47; *Talle I, supra* note 47; *Moore, supra* note 47; *Haselhorst, supra* note 47. See, also, *Teater, supra* note 47.

[80] See *Davis, supra* note 21 (overruling prior cases holding that exemptions under STCA and PSTCA are affirmative defenses that must be affirmatively pled or are waived, reasoning that such cases could not be reconciled with jurisdictional nature of sovereign immunity).

conclude that *Koepf* must be overruled. The siblings have sug-
gested no principled way to distinguish *Koepf* or to reconcile
its reasoning with *Moser*, *Edwards*, *Williams*, and *Dion*, and
we see none.

Although *Moser* implicitly overruled the reasoning of *Koepf*,
we now expressly overrule *Koepf*, along with any other cases
applying similar reasoning to conclude that the exemption for
claims arising out of assault or battery cannot apply to a claim
framed as the negligent failure to protect against a foresee-
able assault or battery. Instead, courts considering whether a
claim falls within the scope of the exemption for claims aris-
ing out of assault or battery should apply settled principles of
strict construction using the analytical framework endorsed in
*Moser*, *Edwards*, *Williams*, and *Dion*.

For the sake of completeness, we acknowledge there are
other appellate cases decided under the STCA and the PSTCA
where the plaintiff's claim plainly involved allegations that
the government was negligent in failing to prevent an assault
or battery, but where our opinion did not directly address the
exemption for claims arising out of assault or battery and
instead resolved the case on its merits.[81] We caution that such

---

[81] See, e.g., *Cingle v. State*, 277 Neb. 957, 766 N.W.2d 381 (2009) (prisoner's
estate brought STCA claim alleging prison employees negligently failed
to prevent fatal assault by cellmate); *Ehlers v. State*, 276 Neb. 605,
756 N.W.2d 152 (2008) (resident of state institution brought STCA
claim alleging institution employees failed to prevent assault by another
resident); *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997) (prisoner
sued under STCA, alleging prison employees negligently failed to prevent
assault by cellmate), *overruled on other grounds, Davis, supra* note 21;
*Richards v. Douglas County*, 213 Neb. 313, 328 N.W.2d 783 (1983)
(stabbing victim brought PSTCA suit against county alleging negligence
in failing to involuntarily commit assailant); *Daniels v. Andersen*, 195
Neb. 95, 97, 237 N.W.2d 397, 400 (1975) (jail inmate assaulted by fellow
inmate in "'drunk tank'" sued police and city for negligent supervision).
See, also, *Webber v. Andersen*, 187 Neb. 9, 187 N.W.2d 290 (1971) (jail
inmate assaulted by cellmate sued city for negligently placing him in cell
with three drunk, belligerent cellmates when police knew or should have
known inmate was at risk of being assaulted).

cases have no precedential value regarding the proper scope or interpretation of the exemption for claims arising out of assault or battery under the STCA or the PSTCA.

Having clarified that the analytical framework endorsed in *Moser* represents the correct legal standard for determining whether a claim falls within the scope of the STCA's exemption for claims arising out of assault and battery, we turn next to the parties' supplemental briefing on the applicability of that exemption to the siblings' claims against DHHS.

### 3. Siblings' Claims Arise Out
### of Assault or Battery

In its supplemental brief, DHHS argues that the siblings "have not alleged any harm that does not arise from an assault or battery within the meaning of § 81-8[,]219(4)"[82] and asserts that all the siblings' claims against DHHS are therefore barred by sovereign immunity.

The siblings disagree and argue that their claims against DHHS fall outside the assault or battery exemption for two reasons. Their first argument focuses on the timing of the alleged negligence. More specifically, the siblings contend that their claims against DHHS do not arise out of assault or battery, because DHHS breached its duty of reasonable care "the minute it placed the [siblings] into a dangerous foster care placement" and consequently the breach occurred before "any physical violence [was] inflicted upon [them]."[83] The opinion in *Doe* made a similar observation about the timing of the breach when seeking to justify the conclusion that the assault or battery exemption did not apply, reasoning:

> [The plaintiff's] claim is not based upon the assault itself, and he could not prevail merely by proving that it occurred. Rather, he alleges that *before* the alleged assault, [the defendant] breached an independent legal

---

[82] Supplemental brief for appellees at 7.

[83] Supplemental brief for appellants at 6.

duty . . . to take reasonable steps to prevent foreseeable violence from occurring on its premises.[84]

But in *Moser*, we rejected this reasoning from *Doe* as semantic reframing, and it can fare no better now. Where, as here, the personal injury claim is premised on allegations that the government negligently failed to protect against a foreseeable assault or battery, the alleged breach of duty will always precede the assault. Indeed, that was the case in *Johnson*, *McKenna*, *Britton*, *Rutledge*, *Moser*, *Williams*, and *Dion*, and in each of those cases, we focused on the nature of the personal injury claim, rather than the allegation of negligence asserted against the government, and we concluded the claim arose out of the assault or battery and thus fell squarely within the scope of the exemption.[85] The same conclusion is required in this case. Given the unqualified breadth of the statutory exemption for "[a]ny claim arising out of assault [or] battery,"[86] we reject the suggestion that the sovereign immunity analysis must focus only on the alleged governmental negligence that preceded the commission of an assault or battery and must ignore that the plaintiff is claiming the government's negligence allowed an assault or battery to occur that injured the plaintiff.[87]

Alternatively, the siblings argue that even if the assault or battery exemption bars their claims against DHHS for personal injury arising out of the physical and sexual abuse they endured, they should still be allowed to recover against DHHS

---

[84] *Doe, supra* note 41, 273 Neb. at 88, 727 N.W.2d at 456.

[85] See, *Dion, supra* note 15; *Williams, supra* note 14; *Moser, supra* note 4; *Rutledge, supra* note 41; *Britton, supra* note 41; *McKenna, supra* note 31; *Johnson, supra* note 41.

[86] § 81-8,219(4).

[87] Accord *Pelham v. Board of Regents*, 321 Ga. App. 791, 796, 743 S.E.2d 469, 473 (2013) ("if a plaintiff's injury was caused by an assault and battery committed by a third party, the state is immune from suit even if the assault and battery . . . resulted from the prior negligent performance of a state officer or employee").

based on trial evidence showing they were also "abused emotionally and mentally in the Ruch household."[88] The dissent makes a similar argument and suggests this case should be remanded so the trial court can consider "a pattern of child abuse that is factually distinct from the physical and sexual assaults the siblings experienced." The fundamental flaw in this argument is that the siblings neither alleged, nor presented at trial, a separate claim arising out of emotional abuse or neglect that was factually or causally distinct from their claim arising out of physical and sexual abuse.

When considering whether a plaintiff has alleged a claim for emotional abuse that is separate and distinct from claims arising out of physical and sexual abuse, an appellate court applies the "gravamen of the complaint test, [and] examines the underlying substance of a dispute in order to determine whether sovereign immunity lies."[89] The gravamen of a complaint "is the 'substantial point or essence of a claim, grievance, or complaint' and is found by examining and construing the substance of the allegations of the complaint as a whole without regard to the form or label adopted by the pleader or the relief demanded."[90]

Here, the operative complaint sought to recover personal injury damages based on allegations that the siblings were "subjected to physical and sexual abuse" by Miles and were later "sexually abused by their father" and that DHHS "knew or should have known that the siblings were being abused," yet failed to protect them from such abuse. Thus, as framed by the operative complaint, the gravamen or essence of the siblings' tort claim was the significant harm caused by the pattern of physical and sexual abuse they endured. The operative complaint sometimes refers to "the assault and battery

---

[88] Supplemental brief for appellants at 8.

[89] *Dion, supra* note 15, 311 Neb. at 541, 973 N.W.2d at 681-82 (internal quotation marks omitted).

[90] *Id*. at 541, 973 N.W.2d at 682.

upon the [siblings]" and other times refers to the siblings'
being "subjected to physical and sexual abuse" or refers more
generally to their "being abused." But the complaint contains
no factual allegations describing any form of abuse *other than*
physical and sexual abuse. To the extent our dissenting col-
league suggests the complaint can be read to allege "claims
of abuse and injuries that are independent of and do not arise
from assault and battery," we must respectfully disagree.

Nor, on this record, can we agree with the dissent's state-
ment that "the siblings have demonstrated acts of abuse that
are independent of the assaults." At trial, the siblings did
not present a separate and distinct claim arising out of emo-
tional abuse. Instead, consistent with the pleadings, the siblings
adduced substantial and compelling evidence that they were
regularly subjected to physical and sexual abuse while living in
the Ruch home and that they suffered permanent physical and
emotional harm as a result of such abuse. Indeed, it was this
evidence that supported the trial court's judgment awarding the
siblings $2.9 million against Miles based on intentional assault
and battery.

The dissent is correct that while testifying about the years of
physical and sexual abuse they experienced, the siblings also
testified about emotional cruelty in the Ruch home, includ-
ing demeaning insults, violent outbursts, and threats of more
violence if the siblings reported any of the assaults to the
authorities. Although we do not minimize the siblings' testi-
mony about the emotional cruelty they experienced in the Ruch
home, the record shows this testimony was adduced while
recounting the pattern of physical and sexual abuse; it was not
presented to support a separate claim unrelated to the physical
and sexual abuse.

The dissent points to the testimony of emotional abuse and
proposes several different legal theories to support the con-
tention that "even under *Moser* . . . , DHHS is not immune
from negligence based on the emotional abuse by the foster
parents." But none of the statutes, studies, or legal theories

proposed by the dissent were presented in the trial court. We therefore assume the primary purpose of discussing these legal theories is not to analyze the case before this court, but to suggest a possible roadmap for future litigants.

But in this case, neither the siblings nor their expert witness testified that the emotional abuse in the Ruch home resulted in harm that was separate and distinct from the harm caused by the ongoing physical and sexual abuse. To the contrary, when proving causation and damages at trial, the siblings' expert witness focused exclusively on the cumulative "effects of childhood physical and sexual abuse" and the psychological and physical harm caused by such abuse. The expert stated that although a variety of childhood adversities (including physical abuse, sexual abuse, and emotional abuse) can impact a child's mental health and development, empirical studies show that "physical and sexual abuse contribute unique harm and damage." There was simply no attempt at trial to prove a stand-alone claim arising out of emotional abuse and no attempt to differentiate the harm caused by childhood physical and sexual abuse from the harm caused by unrelated emotional or verbal abuse. Instead, the expert offered his opinion that the physical and sexual abuse the siblings endured in childhood resulted in physical and emotional harm that manifested differently in each sibling and would require significant treatment and counseling to effectively address.

Because the siblings did not plead or litigate a separate and distinct claim for emotional abuse, and because their own expert attributed all of their physical and emotional injuries to the regular physical and sexual abuse they experienced as children, we respectfully disagree with the dissent that this case should be remanded "with directions to consider separately the siblings' allegations of negligence by DHHS that arose from nonassault abuse by the foster parents." Nor do we see any practical purpose for such a remand, when the district court already made express findings that DHHS did not

breach its duty of reasonable care in selecting or monitoring the siblings' foster care placement and that DHHS reasonably investigated all reports of abuse it received regarding the siblings. The dissent has not articulated any reversible error in these findings. Because any claim that DHHS failed to protect the siblings from emotional abuse would necessarily rest on the same allegations of negligent placement, monitoring, and investigation the district court has already rejected on the merits, a remand would be futile.

As such, whether we focus on the allegations of the operative complaint or on the evidence adduced at trial, our conclusion is the same: The siblings' tort claim against DHHS seeks to recover personal injury damages based on the alleged negligent acts or omissions of DHHS employees in failing to protect the siblings from being physically and sexually abused, in the Ruch home and later in their biological father's home. The siblings' claims are inextricably linked to the physical and sexual assaults, and the physical and psychological harm caused by those assaults is essential to their claims.

As we recognized in *Edwards*:

> [W]hen a tort claim against the government seeks to recover damages for personal injury or death stemming from an assault, the claim necessarily "arises out of assault" and is barred by the intentional tort exemption . . . . The plain language of the exemption and our principles of strict construction require this result no matter how the tort claim has been framed and regardless of the assailant's employment status."[91]

In *Edwards*, we also stated "it is conceivable there could be circumstances where the claim is so attenuated from an assault that it cannot fairly be characterized as arising out of the assault, [but] we do not have such a claim before us today."[92]

---

[91] *Edwards,* supra note 14, 308 Neb. at 277-78, 953 N.W.2d at 756.

[92] *Id*. at 279, 953 N.W.2d at 757.

We must reach the same conclusion on this record. As alleged and tried below, the siblings' tort claims against DHHS necessarily arose out of assault or battery and thus fell squarely within the exemption in § 81-8,219(4).

Because the State has not waived its sovereign immunity as to the siblings' claims against DHHS, the district court lacked subject matter jurisdiction over those claims. We must therefore vacate the judgment of the district court as to DHHS and remand the cause with directions to dismiss the claims against DHHS. The monetary judgment against Miles for intentional assault and battery is unaffected by our reasoning and is affirmed.

## V. CONCLUSION

While it is true that "[i]mmunity from suit against a sovereign state has always resulted in hardship on those falling within its scope,"[93] the authority to determine which tort claims can be brought against the State, and which cannot, is a power the Nebraska Constitution expressly placed in the legislative branch.[94] The Legislature has elected to waive the State's sovereign immunity as to some tort claims, but it used sweeping language to retain immunity for "[a]ny claim arising out of assault [or] battery."[95] This court is required by settled principles of strict construction to read that exemption broadly in order to preserve the State's immunity. Applying those principles here, we must conclude the siblings' claims against DHHS fall squarely within the exemption for claims arising out of assault or battery and thus are barred by sovereign immunity.

There is no debating that the abuse of a child entrusted to the foster care system is deplorable. If the Legislature determines, as a matter of public policy, that tort recovery should

---

[93] *Brown, supra* note 28, 183 Neb. at 442, 160 N.W.2d at 812 (Carter, J., dissenting; White, C.J., and Newton, J., join).

[94] See Neb. Const. art. V, § 22.

[95] § 81-8,219(4).

be allowed against the State or its political subdivisions for at least some claims arising out of assault or battery, it can narrow the scope of the current exemption under the STCA and the PSTCA through the usual lawmaking process. But it is not the proper role of this court, even when faced with tragic and compelling facts, to pick and choose which tort claims arising out of an assault or battery should be permitted under the STCA and the PSTCA and which should not.

Because the siblings' tort claims against DHHS are barred by sovereign immunity, we must vacate the judgment of the district court as to DHHS and remand the cause with directions to dismiss that defendant. In all other respects, the judgment is affirmed.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS.

FUNKE and FREUDENBERG, JJ., not participating.

MILLER-LERMAN, J., dissenting.

In this case, the majority overlooked an opportunity to limit its *Moser* interpretation of the intentional tort exception when it failed to differentiate between immune child assault and nonimmune child abuse. By demonstrating its reluctance to distinguish between the two, the majority has effectively ruled that once there is an assault in the picture rendering the State immune, the State is also immune from suit resulting from cruel emotional child abuse. I do not think this holding is supported by statute or the record. I respectfully dissent.

I disagree with the majority's conclusions in two fundamental respects. I believe the claims of negligence against the Nebraska Department of Health and Human Services (DHHS) arising from the abuse by the foster parents should not be dismissed; I would remand the cause for further proceedings in light of the new law announced today.

First, the majority reasons that whatever "tort recovery should be allowed against the State or its political subdivisions for at least some claims" is "a matter of public policy" that can

be remedied by the lawmaking process. To the contrary, this is not a legislative "public policy" failure. The problematic outcome in this case is the result of the application by the majority of its statutory interpretation in *Moser* and the progeny thereof with which, as I have repeatedly written, I respectfully disagree. See *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022); *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021); *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021); *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020). An assault and battery by a civilian nongovernmental person does not give rise to a statutory "claim," and without a claim, there can be no exception thereto that would relieve DHHS of the liability to which it otherwise consented. One cannot apply the assault and battery exception to a nonexistent claim, and properly read, DHHS is not immune under the statutes as they exist.

Second, the majority concludes that the siblings have neither alleged nor proved harm "separate and distinct" from that caused by the physical and sexual assaults in the period during which the siblings were in the custody of DHHS in foster care. To the contrary, the complaint and record show claims of abuse and injuries that are independent of and do not arise from assault and battery. The complaint and record show that in addition to the beatings and sexual assaults, DHHS failed to remove the siblings from the foster home when it had "actual" notice of the abuse; that for many years, the caseworker "ha[d] been trying to report abuse/neglect" by the foster parents; and that the foster parents warned the siblings that if they reported the abuse and it were investigated, "the only thing they'll be picking up is a dead body." Contrary to the majority opinion, the siblings have demonstrated acts of abuse that are independent of the assaults. So even applying *Moser*, where the conduct makes certain claims not actionable due to an exception, claimants such as the siblings are not barred by the statutes from pursuing distinct claims arising out of conduct not encompassed by an exception. As I said in my partial

dissent in *Dion*, "'[t]he presence of sovereign immunity does not render the State's actions nontortious (it simply means that the State has not consented to suit in its courts with regard to certain claims).' . . . The State's actions are not nonliable." 311 Neb. at 559, 973 N.W.2d at 692 (Miller-Lerman, J., concurring in part, and in part dissenting) (emphasis omitted) (citations omitted). Under the statutes, DHHS is not immune from those claims arising out of abuse.

As explained more fully below in the "Statutory Interpretation" section and the "Application and Resolution" section of my dissent, because the district court was understandably applying *Koepf v. York County*, 198 Neb. 67, 251 N.W.2d 866 (1977), which the majority failed to overrule until today, and quite apart from the beatings and sexual assaults, I would reverse the judgment and remand the cause with directions to consider separately the siblings' allegations of negligence by DHHS that arose from nonassault abuse by the foster parents. I would reverse the order of the district court with respect to the subset of the siblings' negligence claims arising from abuse and remand the cause to the trial court for further proceedings.

## FACTS

In addition to the extensive sexual and physical assaults that are the subject of the majority opinion, the allegations and trial record detail distinct negligence of DHHS related to the foster parents' abuse.

The siblings were in the care and custody of DHHS for a period of their childhood beginning in 1995. In their complaint, the siblings allege that DHHS breached duties owed to them when, inter alia, DHHS knew or should have known that the siblings were being "abuse[d]" while in foster care at various times, "fail[ed] to properly screen and monitor the foster home into which the siblings were place[d]," "failed to follow established policies and procedures in failing to monitor the [siblings'] care," failed "to keep [the siblings] safe,"

failed "to remove [the siblings] from the [foster] home when [DHHS] had actual or constructive notice of the abuse," and failed to supervise the siblings sufficiently to ensure their health, safety, and welfare. The operative complaint was filed in 2016.

The siblings presented evidence that DHHS knew that the foster home had the potential to be dangerous for young children and that the foster mother's history of abuse showed that the foster parents lacked proper judgment. The siblings presented evidence that during the period they were in DHHS' care and custody, DHHS was or should have been aware that the siblings were berated, demeaned, and forced to shower and undress in front of the foster father, so he could masturbate as he watched. The foster father later confessed to the police that he sexually abused Sydnie M. and Abigail S. "a couple of dozen times." The siblings experienced abuse around meals and feeding, were isolated from other siblings, and endured verbal abuse. Both Sydnie and Abigail testified that they were regularly called stupid, ugly, or worthless. The siblings had inappropriate access to guns and ammunition in the foster home. The foster parents attempted to silence the siblings and, according to the testimony, said that if the abuse was investigated, "the only thing they'll be picking up is a dead body."

Examples in our record show that the siblings, along with others reporting on their behalf, sought help from therapists and DHHS, but were not successful at changing the escalating abuse. In 1997, DHHS sent a letter to the foster parents advising them that DHHS had received reports of abuse and neglect in the home. In 1997, DHHS received a report by a daycare worker regarding bruising, and the report also relayed that the foster mother had told a nonplaintiff foster child who is a half sister of the siblings to pack her bags and leave if she did not like it in the home. A 1997 report by DHHS stated that "'the source of [Sydnie's] anger and explosive anti-social feelings needs to be looked at.'" The half sister informed

her therapist in 1997 that the foster father threatened to beat her "'[until] you're not barely breathing'" and that the foster mother told her, "[N]obody wants you.'" In 1997, a DHHS licensing visit at the foster home showed that rifles present there were unlocked and noted an abuse report on the foster mother.

After the foster parents became the siblings' guardians in 1999, a 2004 report stated that the foster mother left the siblings alone for days at a time and that the siblings' clothes did not fit them. In 2004, DHHS received another report about the foster mother, in which it was noted that "[f]or the past ten years, [which included a period in which the siblings were in DHHS custody,] reporter has been trying to report abuse/neglect on [the foster parents]." At that time, DHHS acknowledged that it had received prior intakes "related to abuse and neglect issues."

## CHILD ABUSE

As discussed more fully below in the "Application and Resolution" section of this dissent, our cases and statutes concerning child abuse inform this court's understanding of the nature of the siblings' allegations of "abuse," which in common usage describes multiple modes of harm to children. "Child Abuse" is not synonymous with "assault and battery," the latter of which, as we have recognized, requires harmful or offensive contact. See, *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022); Restatement (Second) of Torts § 13(a) (1965). Child abuse exists separately from assault and battery, and unlike the majority, I do not conflate the conduct underlying these two very different harms.

Nebraska law recognizes that not all cases of child abuse require physical violence or sexual abuse. Neb. Rev. Stat. § 28-707 (Reissue 2016). We have observed that our statutes criminalize a range of physical and mental abuse, neglect, and endangerment and define abuse with "'broad and rather comprehensive language.'" *State v. Mendez-Osorio*, 297

Neb. 520, 534, 900 N.W.2d 776, 787 (2017) (quoting *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990)). See § 28-707. See, also, *State v. Ettleman*, 303 Neb. 581, 930 N.W.2d 538 (2019).

A person commits child abuse under § 28-707(1) if he or she knowingly, intentionally, or negligently causes or permits a minor child to be

(a) Placed in a situation that endangers his or her life or physical or mental health;

(b) Cruelly confined or cruelly punished;

(c) Deprived of necessary food, clothing, shelter, or care;

(d) Placed in a situation to be sexually exploited by allowing, encouraging, or forcing such minor child to solicit for or engage in prostitution, debauchery, public indecency, or obscene or pornographic photography, films, or depictions;

(e) Placed in a situation to be sexually abused as defined in section 28-319, 28-319.01, or 28-320.01; or

(f) Placed in a situation to be a trafficking victim as defined in section 28-830.

Quite apart from assault and battery, § 28-707 includes abuse that endangers a child's mental health. *Mendez-Osorio, supra*. Abuse presenting as criminal endangerment in § 28-707(1)(a) encompasses not only conduct directed at the child but also conduct that presents the likelihood of injury due to the child's having been placed in a situation caused by the defendant's conduct. See *Mendez-Osorio, supra*. Furthermore, causing a child to witness harm is recognized as psychological child abuse. See Restatement of the Law, Children and the Law § 2:22(b) (Tentative Draft No. 3, 2021) (psychological abuse); Stephanie Holt et al., *The Impact of Exposure to Domestic Violence on Children and Young People: A Review of the Literature*, 32 Child Abuse & Neglect 797 (2008).

Notably, we have recognized that child neglect is also encompassed within our understanding of child abuse. Neglect

occurs in the absence of proper parental care, and we have explained that a parent or someone standing in place of a parent provides "'proper parental care'" by, inter alia,

> "providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. It commands special care for the children in special need because of mental condition. It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals."

*In re Interest of Jeremy U. et al.*, 304 Neb. 734, 746, 936 N.W.2d 733, 743 (2020) (commenting in adjudication case).

Across the civil, criminal, and juvenile laws, our statutes and precedent recognize the profound harms caused by child abuse and acknowledge that child abuse may occur by means in addition to assault and battery. See, § 28-707; *In re Interest of Janet J.*, 12 Neb. App. 42, 666 N.W.2d 741 (2003*), disapproved on other grounds, In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003) (recognizing that § 28-707 does not require assault or serious bodily injury).

In *Mendez-Osorio, supra*, we referred to a law journal article that described the Adverse Childhood Experience (ACE) study about childhood exposure to domestic violence. See Lynn Hecht Schafran, *Domestic Violence, Developing Brains, and the Lifespan: New Knowledge From Neuroscience*, 53 Judges' J. 32 (summer 2014). Other courts routinely refer to ACE's. For example, in *State v. Bright*, 200 So. 3d 710, 726 (Fla. 2016), the Supreme Court of Florida referred to ACE study evidence as identifying 10 factors of trauma and adverse environments, stating:

> The ACE factors indicative of trauma are (1) childhood physical abuse; (2) childhood verbal abuse; (3) childhood sexual abuse; (4) childhood physical neglect; (5) childhood emotional neglect; and (6) domestic violence in the household. The factors indicative of an adverse environment are: (7) parents who are separated

or divorced; (8) growing up in a household where someone is incarcerated; (9) growing up in a household where there is someone with a serious alcohol or drug problem; and (10) growing up in a household where there is someone with serious mental illness. If a person encounters just one of those factors, then that person is considered significantly more at risk for psychological and mental problems. Furthermore, the more factors applicable, the higher the risk. For instance, an individual who has experienced five ACE factors is predicted to live twenty years less than an individual without any ACE factor.

It has also been observed that "[a]n increased number of ACEs affects a child's health and brain development." *Tisdale v. State*, 257 So. 3d 357, 363 (Fla. 2018).

As relevant to the instant case, the record contains evidence that each sibling experienced numerous ACE factors and the testimony indicates the cumulative harmful effect of these traumas on the mental health of each of the siblings. Although the majority opinion seems to recognize that the siblings have suffered psychological abuse, it has ruled out an award because it would be difficult to measure the damages. In my view, difficulty in assessing damage due to ACE factors is not a viable legal rationale for denying relief.

THE STATE TORT CLAIMS ACT: STATUTORY
CONSTRUCTION IS NOT A MATTER
OF PUBLIC POLICY, AND THE
STATUTE SHOWS DHHS
IS NOT IMMUNE

Through the State Tort Claims Act (STCA), the Nebraska Legislature has enacted a limited waiver of the State's sovereign immunity with respect to some, but not all, types of tort claims. *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021). See Neb. Const. art. V, § 22 ("[t]he state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought"). Under the

definitional section of the Nebraska statutes, a tort "claim" under the STCA "means any *claim* against the State . . . for money only on account of damage to or loss of property or on account of personal injury or death *caused by the negligent or wrongful act or omission of any employee of the state.*" Neb. Rev. Stat. § 81-8,210(4) (Reissue 2014) (emphasis supplied). So a "claim" is the name given to an "act" by "any employee of the state." *Id.*

The majority has concluded that DHHS is immune from this negligence suit by relying on the intentional tort exception, Neb. Rev. Stat. § 81-8,219(4) (Cum. Supp. 2022), which provides that sovereign immunity is not waived for "[a]ny *claim* arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, or interference with contract rights." See, also, Neb. Rev. Stat. § 13-910(7) (Reissue 2012) (comparable provision of Political Subdivisions Tort Claims Act). According to the majority, when an exception in the STCA applies, a tort claim is not one for which the State has consented to be sued. *Doe v. State*, 312 Neb. 665, 980 N.W.2d 842 (2022). The majority of this court reads the intentional tort exception broadly and concludes, as it has since *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2000), that injuries resulting from assaults caused by nongovernmental actors are claims to which the exception applies and that therefore, DHHS is shielded by sovereign immunity. *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022); *Williams, supra*; *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021).

Unlike *Moser* and its progeny, instead of using the unadorned word "claim," which is a statutory word of art in sovereign immunity cases, the majority herein has started using the terms "tort claim" and "personal injury claim" to describe the intentional acts of the foster parents. Perhaps, the majority has belatedly recognized the fact that "claims" that give rise to immunity (such as an assault) can only be caused by state employees and has refined its language accordingly.

What is specifically at issue in this case is the language of the STCA's exception to the waiver of immunity in § 81-8,219(4), which states: "Any *claim* arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, or interference with contract rights . . ." (Emphasis supplied.) The plain language of § 81-8,219(4) limits its application to any "claim." Section 81-8,210(4) defines a statutory "claim" as any act by an employee of the state. Section 81-8,219(4) does not use the expression "[t]ort claim," defined in § 81-8,210(4), and reference to "tort claim" by the majority attempts to substitute "tort claim" and its baggage for "claim" in § 81-8,219(4) and is a distraction. The exception in § 81-8,219(4) simply applies to "statutory claim," which under § 81-8,210(4) is an act "of any employee of the state."

In any event, in this case, there is a statutory "claim" for negligence against DHHS, but there is no statutory "claim" of assault by a DHHS employee. No one claims the caseworkers assaulted the siblings. Where there is no statutory claim of assault by a State actor, there is no exception. See § 81-8,210(4) ("claim" covered by STCA is one involving act by "any employee of the state"). Where there is no statutory claim of assault by a state employee, there is no intentional tort exception and there is no immunity based on an intentional tort. In its order discussing the charges of harm against DHHS, the district court found that such harm "was not caused by an 'assault and battery.'"

As recited above, the "claims" covered by the STCA are those claims that involve "the negligent or wrongful act or omission of any employee of the state." § 81-8,210(4). As a matter of statutory construction, it logically follows that, as stated by the U.S. Supreme Court:

> The exception [of assault and battery] should therefore be construed to apply only to claims that would otherwise be authorized by the basic waiver of sovereign immunity. Since an assault by a person who was not

employed by the Government could not provide the basis for a claim under the [Federal Tort Claims Act or the STCA], the [intentional tort] exception could not apply to such an assault; rather, the exception only applies in cases arising out of assaults by federal [or state] employees.

*Sheridan v. United States*, 487 U.S. 392, 400, 108 S. Ct. 2449, 101 L. Ed. 2d 352 (1988).

My view continues to be that assaults by state employees acting within their scope of employment are claims and fall within the STCA but are relieved by its exemptions; assaults by nonstate actors are not statutory claims and do not fall within the STCA. As stated in my dissent in *Moser v. State*, 307 Neb. 18, 43-44, 948 N.W.2d 194, 211 (2020) (Miller-Lerman, J. dissenting), the U.S. Supreme Court case of *Sheridan, supra* (to which I subscribe, but the majority rejects),

> has been described as carving out an "exception to an exception to an exception to a general rule." *CNA v. United States*, 535 F.3d 132, 148 (3d Cir. 2008). The general rule is sovereign immunity, the first exception is the [STCA's] limited waiver of the government's immunity, the second exception is the intentional tort exception that reinstates the government's immunity, and the third exception is the narrow category of cases, identified in *Sheridan*, which may proceed against the sovereign. As noted, the third category [certain acts of negligence by state employees] reflects the independent affirmative duty doctrine.

The majority states that the outcome in this case is a matter of public policy that could be remedied by the Legislature. Indeed, the majority has repeatedly suggested the Legislature could address its *Moser*-based ruling. See *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021). Furthermore, several legislative bills have been introduced in recent years to address the *Moser* problem. See, 2024 Neb. Laws, L.B.

25 (vetoed by Governor after legislative session) and L.B. 1192; 2023 Neb. Laws, L.B. 325 and L.B. 341; 2021 Neb. Laws, L.B. 54. But in my view, this issue is one of statutory construction, not public policy, and the solution is within the majority's grasp. In the absence of ambiguity, statutory interpretation is not a matter of public policy. See *Espinoza v. Job Source USA*, 313 Neb. 559, 984 N.W.2d 918 (2023). Absent such reevaluation by the majority, Nebraskans are bound by *Moser*, and I next apply *Moser* to this case and conclude that even applying *Moser* and given the record of abuse, DHHS is not immune from suit for nonassault abuse-based acts.

## STATUTORY INTERPRETATION: APPLICATION OF ONE EXCEPTION TO WAIVER OF IMMUNITY DOES NOT BAR OTHER DISTINCT CLAIMS ARISING FROM OTHER FACTUAL CIRCUMSTANCES

Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *In re Guardianship of Jill G.*, 312 Neb. 108, 977 N.W.2d 913 (2022). Further, under the legal principle of expressio unius est exclusio alterius, "'an expressed object of a statute's operation excludes the statute's operation on all other objects unmentioned by the statute.'" *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 14, 917 N.W.2d 133, 143 (2018). The exception statute, § 81-8,219(4), applies only to claims arising out of the enumerated acts of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, or interference with contract rights, and not to a claim arising out of abuse or other acts not listed.

### DISTINCT ALLEGATIONS AND PROOF

Interpreting the federal counterpart to the STCA, 28 U.S.C. § 2680(h) (2018), the U.S. Supreme Court has acknowledged that "when one aspect of the Government's conduct

is not actionable" under a statutory exception to the waiver of sovereign immunity, a claimant is not necessarily barred from pursuing a "distinct claim arising out of other aspects of the Government's conduct." *Block v. Neal*, 460 U.S. 289, 298, 103 S. Ct. 1089, 75 L. Ed. 2d 67 (1983) (interpreting language in Federal Tort Claims Act, § 2680(h)). We applied a similar principle in *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999), *abrogated, A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010), where we noted that even though a series of causal events or instruments may include an element that, alone, would be excepted by § 81-8,219, the STCA does not preclude a tort claim when it arises out of other acts not enumerated by § 81-8,219 (§ 81-8,219 stating that despite presence of "snow or ice condition[] or other temporary condition[] caused by nature on any highway" for which that State is immune under exception, State was not immune if proximate cause of injury was poor condition of road itself). As I observed in my partial dissent in *Dion v. City of Omaha*, 311 Neb. 522, 559, 973 N.W.2d 666, 692 (2022) (Miller-Lerman, J., concurring in part, and in part dissenting):

> "[T]he *presence of sovereign immunity* does not render the State's actions nontortious (it simply means that the State has *not consented to suit* in its courts with regard to certain claims)." *Wallace v. Dean*, 3 So. 3d 1035, 1045 (Fla. 2009) (emphasis in original). The State's actions are not nonliable. See *id.* The presence of sovereign immunity is distinct from lack of liability. See *id.*

Similarly, I have previously observed elsewhere that immunity under one statute does not necessarily indicate that an action will be barred under another statute with a differing scheme. *Dion, supra* (Miller-Lerman, J., concurring in part, and in part dissenting) (citing *Davis v. Harrod*, 407 F.2d 1280 (D.C. Cir. 1969)).

The immunity issue must be evaluated on appeal in light of the allegations and proof introduced at trial. See *Woollen,*

*supra*. And we have counseled against reading the exception that precludes liability so broadly that it eclipses the limited waiver of immunity in the STCA. See *Brown v. State*, 305 Neb. 111, 939 N.W.2d 354 (2020) (stating that exception should not be read so broadly that it has judicially expanded exception). As articulated by the D.C. Court of Appeals, a tort claim distinct from a claim barred by an intentional tort exception to the Federal Tort Claims Act is viable if it includes "at least one distinct element, involving an independent breach of a standard of care," that a fact finder may "analyze[] and consider[] . . . on its own terms apart from the intentional tort of battery." See *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003) (discussing negligence claim not based on excepted excessive force claim).

Georgia courts have interpreted the intentional tort exception to the waiver of sovereign immunity in The Georgia Tort Claims Act, Ga. Code Ann. § 50-21-24 (7) (2009), in a manner unlike the U.S. Supreme Court in *Sheridan v. United States*, 487 U.S. 392, 108 S. Ct. 2449, 101 L. Ed. 2d 352 (1988), but similar to the majority's reading of the STCA announced in *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020), which the majority applies yet again today. The cases in Georgia under a *Moser*-like scheme are instructive. The Georgia intentional tort exception provides that the state shall have no liability for losses resulting from "[a]ssault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, or interference with contractual rights." § 50-21-24(7). The Georgia courts considering whether the state has waived its immunity focus on the nature of "the act causing the underlying loss regardless of who committed the act." *Youngblood v. Gwinnett Rockdale, Etc.*, 273 Ga. 715, 717, 545 S.E.2d 875, 878 (2001). Thus, Georgia courts focus on whether the damage was suffered exclusively because of the assault and battery, as distinguished from other causes. See *Beasley v. Georgia Dept. of Corrections*, 360 Ga. App. 33, 861 S.E.2d 106 (2021).

A federal district court in Georgia applied Georgia law to a complex case against Georgia's department of human services involving child abuse, where the state had placed a child into the custody of a couple who abused her and ultimately killed her. *Daniel v. Georgia Dept. of Human Services*, 420 F. Supp. 3d 1350 (N.D. Ga. 2019). The custodian asserted that the child's death occurred after the child choked on a "chicken tender" and the custodian "performed the Heimlich maneuver" and hit the child on the back to dislodge the food. *Id*. at 1362. Autopsy records showed that the child's body was battered and beaten, but also showed that the child suffered from blunt impact injuries to her torso that "'reflect inflicted trauma.'" *Id*. The court noted that the Georgia intentional tort exception could immunize the state from liability for the custodian's having killed the child if the child's death resulted solely from an assault or battery. *Id*. However, because it was possible that a fact finder could find liability based on other acts for which the state would be responsible, the application of the assault and battery exception was a triable question. That is, just because assault is in the picture, it does not preclude liability on another basis.

The majority has concluded that there is no harm that was "separate and distinct" from physical and sexual assaults. The majority concludes analytically that "but for" the assaults, there are no injuries. On this record, I cannot agree. As I stated in my dissent in *Moser*:

The "but for" rationale adopted by the majority suffers from several defects, including confusing "claim" with "injury." Not only is it belied by the language of the statute [defining "claim"] discussed above, but it ignores a basic precept of tort law that one injury "can arise from more than one wrongful act[s]"—in this case, a negligence "claim" which is distinct from an assault. See *Sheridan v. United States*, 487 U.S. 392, 405, 108 S. Ct. 2449, 101 L. Ed. 2d 352 (1988) (Kennedy, J., concurring). See, also, 1 Restatement (Third) of Torts:

Liability for Physical and Emotional Harm § 34 (2010). An event may have more than one proximate cause. See 1 Restatement (Third), *supra.* An intentional act intervening between a negligent act and the result does not always vitiate liability for the negligence. *Id.* A superseding cause of harm will not excuse an actor's negligence where the actor should have realized the likelihood that such a situation might be created and the third person might avail himself of the opportunity to commit such a tort or crime. *Id.* As Justice Kennedy stated in *Sheridan*, the "but for" approach adopted by the *Sheridan* dissent (and by this court's majority) implies that the "intentional act somehow obliterates the legal significance of any negligence [or abuse] that precedes or follows it." 487 U.S. at 406 (Kennedy, J., concurring).

307 Neb. at 42, 948 N.W.2d at 210 (Miller-Lerman, J., dissenting).

In line with the foregoing authorities, I conclude that when an action against the State includes proof of abuse that is separate and distinct from the intentional torts of assault or battery, the intentional tort exception does not preclude liability for the abuse. The actions of DHHS are not nonliable.

### Example of Proof of Distinct Abuse

The majority opinion repeatedly states that all claims of abuse in this case are the result of either an assault or battery or are so intertwined with an assault or battery that DHHS is exempt from liability under the statutory exemption for intentional acts. That is, in the majority's view, there are no instances of abuse that are independent of an assault or battery. The majority opinion suggests that under § 81-8,219(4), once assault and battery are in the picture, all acts of abuse arise therefrom and the intentional act somehow obliterates the legal significance of other acts. I disagree with the majority's reading of the statute and do not believe such reading is what the Legislature intended. Echoing our opinion in *Brown*

*v. State*, 305 Neb. 111, 122, 939 N.W.2d 354, 362 (2020), the majority's opinion has read the exception so broadly that it has "judicially expand[ed] the . . . exception."

As to the majority view that there is no act of abuse separate and distinct from assault and battery, I believe the record refutes this assertion and that to the contrary, there is testimony regarding incidents not necessarily directed toward the siblings. By way of example, I refer to the following testimony of Abigail regarding the foster father's hurting pet dogs:

[Abigail:] And then another incident I can think of that wasn't necessarily towards us children in the home, but if the dogs - they had weiner dogs, Dachshund dogs, if they would do anything naughty, they would take the dog and shove it in the trash can as hard as they could to hurt the dog and the dog's nose if it did anything bad.

[Counsel:] Did they do that often?

[Abigail:] Yes. Anytime the dog did anything that was — they didn't like, you know, the dog maybe got excited and peed a little bit or was in their way when they were walking or if — you know, just anything that you could think of that would annoy them, they would do that to a dog.

According to an article quoting Professor Margaret Drew of the University of Massachusetts Law School, "[s]ometimes animals are abused in front of kids," which "'keeps the children under the abuser's control as well.'" Julianne Hill, *Animal Abuse and Domestic Violence Can Go Hand in Hand*, 109 A.B.A. J. 57 (2023). The cases are in accord. E.g., *People v. Bishop*, No. F076745, 2022 WL 1420932 (Cal. App. May 5, 2022) (unpublished opinion) (stating abuse of dogs in presence of family member constitutes domestic violence). In *People v. Kovacich*, 201 Cal. App. 4th 863, 895 133 Cal. Rptr. 3d 924, 951 (2011), the defendant admitted that he "'went overboard'" kicking the family dog as a form of discipline after it "got into" some garbage. However, he stated that he did not believe the dog died from the kicking and that family

members' seeing him kick the dog was "not 'out of the ordinary.'" *Id*. The opinion continued that in an abusive relationship, "harming an animal is 'a very high-level threat to the victim as to the ability of the perpetrator to not only threaten to do something incredibly harmful but to actually act it out in front of them.'" *Id*. The court ruled that this behavior was an "abuse . . . committed against [the defendant's] wife and children," who witnessed the act, which "amounted to 'domestic violence'" within the California statutes. *Id*.

Similarly, in the present case, the siblings suffered abuse separate and distinct from assault and battery by witnessing the dog's being harmed. This exemplifies a circumstance we anticipated in *Edwards v. Douglas*, 308 Neb. 259, 279, 953 N.W.2d 744, 757 (2021), "where the claim . . . cannot fairly be characterized as arising out of the assault" and battery. Therefore, the injuries of the siblings that do not arise from assault and battery upon the siblings do not give rise to immunity.

APPLICATION AND RESOLUTION

As observed in my discussion above, by applying *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020), the majority has concluded that the acts of assault and battery perpetuated by nongovernmental persons immunize DHHS. But even under *Moser*, as long as the bad acts in this case are not exclusively those excepted under the intentional tort exception for assault or battery, § 81-8,219(4), DHHS is not completely immunized. So, if this case is about abuse as distinguished from assault and battery, DHHS is not immune. I conclude that this case involves actionable abuse and that DHHS is not immune from negligence arising from the abuse.

As discussed above, abuse is different from assault and battery. Indeed, the American Law Institute has taken the position that "psychological abuse is the most widely under-reported form of child maltreatment even though some experts conclude that it is the most harmful and has the longest

lasting, and potentially permanent, effects." Restatement of the Law, Children and the Law § 2.22, comment *a*. (Tentative Draft No. 3, 2021). And we have recognized that some claims can be sufficiently attenuated from an assault such that they are not encompassed by the intentional tort exception. See *Edwards, supra*.

Nebraska case law and statutes are informative. As noted above, we have defined "abuse" with "'broad and rather comprehensive language.'" *State v. Mendez-Osorio*, 297 Neb. 520, 534, 900 N.W.2d 776, 787 (2017). As further noted above, § 28-707 includes abuse that endangers a child's mental, as well as physical, health. Abuse includes being deprived of necessary food, clothing, shelter, or care. § 28-707. Child abuse differs from assault and battery, the latter of which generally includes physical contact or violence.

The complaint and the evidence at trial amply show that the foster parents abused the siblings. As recited above, the complaint alleged that DHHS breached duties owed to the siblings when, inter alia, DHHS knew or should have known that they were being "abuse[d]" while in foster care at various times, failed "to properly screen and monitor the foster home into which the siblings were place[d]," failed "to follow established policies and procedures in failing to monitor the [siblings'] care," failed "to keep [the siblings] safe," failed "to remove [the siblings] from the [foster] home when [DHHS] had actual or constructive notice of the abuse," and failed to supervise the siblings sufficiently to ensure their health, safety, and welfare.

Also, as recited above, the evidence at trial showed, as the siblings claimed, that during the period they were in DHHS' care and custody, DHHS was or should have been aware that the siblings were berated, demeaned, starved, and forced to shower and undress in front of the foster father. The siblings experienced abuse around meals and feeding, were isolated from other siblings, and endured verbal abuse. Both Sydnie and Abigail testified that they were regularly called stupid,

ugly, or worthless. The siblings had inappropriate access to guns and ammunition in the foster home. The foster parents attempted to silence the siblings and, according to the testimony, said that if the abuse were investigated, "the only thing they'll be picking up is a dead body." This case involves abuse independent and distinct from assault and battery.

I believe the majority's conclusion that the siblings have not demonstrated harm "separate and distinct" from that caused by physical and sexual assaults of the siblings is not an accurate reflection of the record. The approach of the majority ignores a pattern of child abuse that is factually distinct from the physical and sexual assaults the siblings experienced in the foster home. As explained above, acts of abuse are not enumerated in the intentional tort exception to the waiver of sovereign immunity in § 81-8,219(4) and should be considered on their own apart from the intentional torts of assault and battery. Considered on its own, abuse is a separate and distinct basis of liability, and even under *Moser v. State*, 307 Neb. 18, 948 N.W.2d 1194 (2020), DHHS is not immune from negligence based on the emotional abuse by the foster parents.

## CONCLUSION

When the siblings filed their complaint in 2015, *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977), had been controlling precedent for nearly 40 years and held that the assault and battery exception did not apply to a claim of negligent foster care placement or supervision. After the siblings, relying on *Koepf*, presented their case in chief and rested, DHHS brought the recently filed *Moser* opinion to the district court's attention. Although *Moser* may have cast doubt on *Koepf*, it did not explicitly overrule that precedent.

The parties and the district court have been caught in the midst of this evolving legal framework. In view of the majority's conclusion today overruling *Koepf* and the changed circumstances created thereby, rather than dismiss, I would

remand the cause and afford the siblings and the district court an opportunity to evaluate the cause within the new legal landscape. We have recognized that the appellate court has the power to vacate an order for which there is no jurisdiction and remand the cause with appropriate directions. See *Davis v. Moats*, 308 Neb. 757, 956 N.W.2d 682 (2021). One appellate court has observed that in the interest of justice, "'[t]he most compelling case for such a remand is where we overrule existing precedents on which the losing party relied at trial.'" *Bulanek v. WesTTex 66 Pipeline Co.*, 209 S.W.3d 98, 100 (Tex. 2006).

While under the eye of DHHS and in its custody, the siblings were beaten, sexually assaulted, and emotionally abused by the foster parents. The people paid to keep them safe delivered fear. As explained above, in my view, even under the *Moser* line of cases created by the majority, the siblings can sue the State for damages caused by the nonassault cruel emotional abuse. However, under the majority's reading of the statutes, they cannot sue the State. Is this what the Legislature intended?